GAIL POULOS COTY, Plaintiff-Appellee, *v.* U. S. SLICING MACHINE COMPANY, INC., Defendant-Appellant.—(YANKEE DOODLE HOUSE, INC., Defendant.)—GAIL POULOS COTY, Plaintiff-Appellant, *v.* YANKEE DOODLE HOUSE, INC., Defendant-Appellee.

Second District   Nos. 76-407, 76-408 cons.

Opinion filed March 14, 1978.

Roger K. O'Reilly and Edward J. Walsh, Jr., both of Wheaton, for appellant Gail Poulos Coty.

D. Kendall Griffith and Donald W. Garlinger, both of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Wheaton, for appellant U. S. Slicing Machine Company, Inc.

Stephen J. Mrkvicka, of Matthews, Dean, Eichmeier, Goodin & Mrkvicka, of Aurora, for appellee Yankee Doodle House, Inc.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiff, then age 15, was injured while operating a meat slicing machine on the premises of her employer the Yankee Doodle Dandy restaurant, a fast-food franchisee, located in Elgin. As material here she sued the defendant franchisor, Yankee Doodle House, Inc., on the theory of negligence and willful and wanton misconduct and sued the defendant, U. S. Slicing Machine Company, Inc., the manufacturer of the machine, on the theory of strict liability in tort. The cases were tried together before a jury. At the close of the plaintiff's evidence the court directed a verdict in favor of the defendant franchisor, from which plaintiff appeals (76-408). In the case against the manufacturer the court directed a verdict in favor of the plaintiff on the defense of assumption of risk; and the jury found the manufacturer guilty and assessed damages against it in the amount of $100,000. The manufacturer appeals from the judgment entered on the verdict (76-407). We consolidate the appeals for opinion.

### I.
### (76-408)

We first conclude that the court properly directed a verdict for the franchisor. Plaintiff's theory of liability is that the franchisor was aware that minors operated the beef slicing machine, was aware of applicable prohibitory State and Federal child labor laws, and under the franchise agreement had the power to prevent such dangerous operations from being performed by minors; and therefore that its responsibility for its breach of duty should have been submitted to the jury. We cannot agree.

Under the franchise agreement numerous restrictions were imposed upon the franchisee relating to the general nature of the operation of the restaurant. The restrictions were principally geared towards protecting the Yankee Doodle trademark and the good will associated with it. It was required that the manager be trained by the franchisor; all the employees

were required to wear distinctive uniforms; minimum hours and days of service were set down; and contributions to and participation in advertising programs were required. The franchisee also covenanted to comply with all "Federal, State, County and City laws, ordinances and regulations affecting directly the operation of said restaurant." The franchisor, however, did not retain any day-to-day supervisory control, could not hire or fire anyone, could not stop work in the restaurant immediately nor could it give any orders to any of the franchisee's employees. The agreement provided that if the franchisee breached any of the covenants of the agreement the franchisor could give a ten day written notice demanding cure of the breach; and if the franchisee failed to cure the breach, the franchisor's only remedy was to terminate the entire franchise agreement.

It further appears from the evidence that the operation of meat slicing machines by children under 18 years of age was forbidden by the Fair Labor Standards Act (29 U.S.C. §201 *et seq.* (1970)) and regulations adopted thereunder (29 C.F.R. part 1500, subpart E). An executive of the franchisor testified that he was aware of the Federal rules in this area and that the franchisee was, apparently, not conforming to them.

We have not found any Illinois authority which deals with the question of the responsibility of the owner of a franchise trademark for the torts of its franchisee. Courts in other jurisdictions have analyzed the issue on agency principles. None of the cases, however, deal with the specific question raised by this defendant, whether the franchisor may be held liable on other than agency principles for alleged negligent supervision of its franchisees. In *Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 219 S.E.2d 874 (1975), plaintiff had slipped and fallen at a Holiday Inn owned by the "Betsy-Len" corporation which was the franchisee. She sued the franchisor corporation for her injuries on the theory that the franchisor owned and operated the motel and that its agents and employees were negligent. The trial court granted summary judgment in favor of the franchisor as a matter of law finding that under the agreement between the parties there existed no principal-agent or master-servant relationship. The judgment was affirmed on appeal. Substantially in conformity with the facts in this case, the franchise agreement with Holiday Inn, the trademark owner, required that the franchisee construct its motel according to the franchisor's specifications, that it contribute to national advertising campaigns, that the manager, housekeeper and restaurant manager be trained by the franchisor, and, generally, that the franchisee conduct the enterprise under the "system" which included the trademark, architectural design, insignia, patterns, color schemes, styles, furnishings, equipment, advertising services and methods of operation.

The Supreme Court of Virginia in holding that the franchisor was not subject to liability asserted:

> "Having carefully considered all of the regulatory provisions in the agreement, we are of opinion that they gave defendant no 'control or right to control the methods or details of doing the work', * * * and, therefore, agree with the trial court that no principal-agent or master-servant relationship was created. * * * The regulatory provisions did not give defendant control over the day-to-day operation of Betsy-Len's motel. While defendant was empowered to regulate the architectural style of the buildings and the type and style of furnishings and equipment, defendant was given no power to control daily maintenance of the premises. Defendant was given no power to control Betsy-Len's current business expenditures, fix customer rates, or demand a share of the profits. Defendant was given no power to hire or fire Betsy-Len's employees, determine employee wages or working conditions, set standards for employee skills or productivity, supervise employee work routine, or discipline employees for nonfeasance or misfeasance. All such powers and other management controls and responsibilities customarily exercised by an owner and operator of an on-going business were retained by Betsy-Len." (219 S.E.2d 874, 877-78 (1975).)

See also *McLaughlin v. Chicken Delight, Inc.*, 164 Conn. 317, 321 A.2d 456, 460 (1973).

The results in the cited cases involving franchise agreements appear to be consistent with the rationale of the cases principally cited by the parties which involve relationships of employers with independent contractors. In those cases if the evidence is sufficient to show that the employer of an independent contractor retains control over the "operative details" of doing any part of the work, he is subject to liability for negligence of the employees of the independent contractor on agency grounds, otherwise not; but if the employer retains some supervisory control over the manner in which the work is done, short of control over the "operative details", he will be subject to liability for negligence in the exercise of that control. (See, *e.g.*, *Weber v. Northern Illinois Gas Co.*, 10 Ill. App. 3d 625, 638-39 (1973); *Pasko v. Commonwealth Edison Co.*, 14 Ill. App. 3d 481, 489 (1973); *Foster v. Englewood Hospital Association*, 19 Ill. App. 3d 1055, 1065 (1974). See also Restatement (Second) of Torts §414 (1965).) However, the mere reservation of "a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations * * * does not mean

that the contractor is controlled as to his methods of work, or as to operative detail." *Weber v. Northern Illinois Gas Co.*, 10 Ill. App. 3d 625, 639, citing the Restatement (Second) of Torts §414 (1965). See, *e.g., Ryan v. City of Chicago*, 28 Ill. App. 3d 743, 749 (1975); see also *Nowicki v. Union Starch & Refining Co.*, 54 Ill. 2d 93, 98-99 (1973).

■■ The employer-independent contractor cases, upon which the litigants almost exclusively rely, are somewhat inapposite. The franchisee is not in any usual sense an independent contractor of an "employer." However, the general rationale of the cases, that a person who possesses a right to supervise the internal operations of another's enterprise, which includes a right to veto an unsafe procedure, may be liable for the negligent failure to do so, can be applied to the franchise cases. However, this right to interdict unsafe practices must consist of something more than a general right to make suggestions or recommendations or to order the work stopped or resumed. (See *Weber v. Northern Ill. Gas Co.*, 10 Ill. App. 3d 625, 639.) Here the franchisor did not retain the right to directly order children-employees away from the meat slicing machines nor could it have "stopped the work" because the franchisee refused to order such employees away from the hazard. (*Cf. Pasko v. Commonwealth Edison Company* (1973), 14 Ill. App. 3d 481, 489.

■■ The franchisor here, it is true, did retain a right to terminate the entire franchise agreement, but only after a 10-day notice for breach of any covenant. One of these covenants required faithful observance by the franchisee of all relevant laws, Federal, State and local, including the provision under the Fair Labor Standards Act that forbade operation of meat-slicing machines by children under 18 years of age as previously noted; and a Yankee Doodle executive admitted in the hearing before the court on the motion to dismiss the franchisor that he was aware of the Federal rules in this area and that the franchisee was, apparently, not conforming to them. The franchisor could, therefore, have requested or demanded that the franchisee stop employing children in the proscribed manner and if the franchisee failed to comply could have terminated the entire franchise agreement. This general right to rescind the contract or "call off the work" is insufficient, however, under the reasoning of the cited cases to subject the franchisor to liability under either agency or employer-independent contractor theories.[1]

---

[1] Another possible analogy may be sought in the "gas station" cases (see generally 38 Am. Jur. 2d *Garages, and Filling and Parking Stations* §137 (1968)) where the courts have generally held that oil suppliers are not liable for the torts of gas station operators, even where the oil supplier is the owner-lessor of the station, exercises some supervision over the operation of the station, regularly inspects for possible violations of the governing contract and generally sets the pattern of the activity on the premises. See, *e.g., Elbers v. Standard Oil Co.*, 331 Ill. App. 207, 222 (1947); *Richardson v. Bulk Petroleum Corp.*, 11 Ill. App. 3d 655, 658-59 (1973).

We therefore affirm the judgment of the trial court in case No. 76-408.

## II.
### (76-407)

We next consider whether the issue of plaintiff's assumption of the risk of her injury by using a machine which was unreasonably dangerous because of an obvious defective design[2] should have been submitted to the jury as a question of fact. Alternatively we must also consider defendant's argument that the plaintiff assumed the risk as a matter of law.

■■ The doctrine characterized as "assumption of risk" may be properly raised as a defense to a products liability action in Illinois. (*Williams v. Brown Manufacturing Co.*, 45 Ill. 2d 418, 430-31 (1970).) The burden of pleading and proving that the plaintiff assumed the risk, however, is upon the defendant. (*Sweeney v. Max A. R. Matthews & Co.*, 46 Ill. 2d 64, 66 (1970); *Reese v. Chicago, Burlington & Quincy R. R. Co.*, 55 Ill. 2d 356, 360 (1973).) "A determination of the propriety of the trial court's action in striking the affirmative defense of assumption of risk must be predicated upon consideration of the totality of the evidence in its aspect most favorable to defendant. (*Pedrick v. Peoria & Eastern R. R. Co.*, 37 Ill. 2d 494.)" *Williams v. Brown Manufacturing Co.*, 45 Ill. 2d 418, 431 (1970).

The evidence in its aspect most favorable to the defendant U. S. Slicing Machine Company is therefore reviewed. The plaintiff began to work at the restaurant in May of 1971 when she was 14 years old. Her duties essentially consisted of "making sandwiches and pouring drinks and ringing the register and waiting on people." At about one o'clock in the afternoon of August 11, 1972, plaintiff received an order for several roast beef sandwiches and went to the beef slicing machine manufactured by the defendant to cut the meat. A similar machine was in court and a number of witnesses demonstrated its operation. From the record it appears that the machine consists of a rotary blade which revolves on a stationary axis, and a moving meat tray. The operator of the machine need only place the meat on the tray and activate the engine by a switch; the tray then moves back and forth into the blade about once every

---

[2] Defendant does not challenge the factual issue that the machine was unreasonably dangerous by reason of its defective design. While there was conflicting evidence relative to whether a slicing machine to cut hot roasts of meat into extremely thin slices as required in the franchise product was available on the market, there was evidence that a safety guard could have been devised which would have prevented the operator from getting her hand into the machine while it was running. There was also conflicting evidence as to whether a perforated pan holding the meat could have been designed to run off the juice.

second and at the same time is propelled forward by a reciprocating gear; and in the process the roast of beef is propelled into the blade and sliced.

On this occasion, plaintiff activated the machine in the normal way; she then noticed that the operation of the machine was causing juice to splash "all over"; and to remedy this situation she turned off the machine and covered the roast beef with paper towels. As far as she could remember this was the second time she had used paper towels in the meat tray to soak up meat juices, the first time being approximately 30 days before. She said that the manager had previously told her to do that. She then switched the machine on but observed that the paper towels were being sliced along with the meat and were mixing with it on the "drop-off" tray. She then moved to the side of the machine and removed some of the paper, then returned to the front and attempted to remove the remaining paper from the moving roast beef. Her hand, however, moved with the roast beef and was lacerated by the rotary blade.

The manufacturer first argues that plaintiff assumed the risk of her injury because she was aware of both the automatic operation of the machine and the inherent hazard of the machine's operation, based on her testimony that the machine sliced the meat automatically, that she knew that the machine could be stopped by using the switch, and that she had probably operated the machine every day for almost 15 months of her employment.

Plaintiff argues that she could not have assumed the risk under the circumstances which included the facts that she was only 15 years of age, had been given only limited instructions on the use and operation of the slicing machine, which was devoid of any instructions or warnings with respect to its unreasonably dangerous operation; and that pursuant to the instructions of her immediate supervisor she crumpled paper towels and placed them to the right of the roast beef on the tray as she faced the end that was being cut and that the machine itself caused her hand to move and come in contact with the defectively guarded knife blade.

■■ Although the court in *Williams v. Brown Manufacturing Co.* did not render a precise definition of the defense of "assumption of risk" it indicated a general agreement with the definition set out in the Restatement (Second) of Torts, section 402A, comment (n) (1965) (45 Ill. 2d 418, 426), which defines assumption of risk in the context of products liability, as "voluntarily and unreasonably proceeding to encounter a known danger * * *."

The Restatement definition has been followed in various appellate opinions. (See, *e.g.*, *Ralston v. Illinois Paper Co.*, 13 Ill. App. 3d 95, 98 (1973); *Scott v. Dreis & Krump Manufacturing Co.*, 26 Ill. App. 3d 971, 990 (1975); *Doran v. Pullman Standard Car Manufacturing Co.*, 45 Ill.

App. 3d 981, 989 (1977).) Similarly, Prosser on Torts (§103, at 671 (4th ed. 1971) takes the position that assumption of risk in products liability cases is more circumscribed than traditional assumption of risk and must involve both voluntarily proceeding to encounter a known danger and conduct which is objectively unreasonable (traditional contributory negligence). See also *Johnson v. Clark Equipment Co.*, 274 Ore. 403, 547 P.2d 132, 138 n. 5 (1976).

■■ Although it is not expressly stated there is an implication that defendant's argument is in part that plaintiff assumed the risk of operating a meat slicer which was unreasonably dangerous because of inadequate guards against touching the moving blade by the mere acceptance and continuance of her employment. We cannot agree. One does not voluntarily and unreasonably assume the hazard of using a defectively designed product which is unreasonably dangerous by mere acceptance of employment. (*Scott v. Dreis & Krump Manufacturing Co.*, 26 Ill. App. 3d 971, 990 (1975).) Under the Restatement-Prosser definition of assumption of risk in products liability cases it would be necessary for the defendant to show that plaintiff acted "unreasonably" in accepting and continuing her employment as a food server at Yankee Doodle. Mere acceptance and continuance in such employment on this record does not appear to be unreasonable and therefore her continuance in a somewhat hazardous job was not an assumption of risk.

Defendant's main argument, however, is that plaintiff assumed the risk by placing her hand on the meat tray, an object that was moving back and forth about once every second into and out of the rotary blade, without first turning off the slicing machine.

In this connection it is important to consider carefully what plaintiff did: she reached for a paper towel that covered a roast beef on a moving tray; she did not place her hand in the way of the blade which was stationary; she first went to the side of the moving roast beef to remove some of the paper; a few seconds later, she returned to the front of the machine and tried to remove the remaining paper; and, in doing this, her hand moved with the paper towel and the roast beef into the blade.

■■ It is not sufficient that a jury could draw the reasonable inference that a 15-year-old girl would be aware of and would appreciate the danger in these circumstances. Plaintiff's action in seeking to remove the paper towel without stopping the machine must be deemed a "voluntary" act in order for it to constitute an assumption of the risk. In *Scott v. Dreis & Krump Manufacturing Co.*, 26 Ill. App. 3d 971, 990-91 (1975), the court stated:

> "There must, we think, be an element of conscious conduct resulting in the injury which is not satisfied by mere inadvertence or momentary inattention."

It has been held that a "split-second decision" made under emergency conditions is not a voluntary act which may amount to "assumption of the risk." (See *Collins v. Musgrave*, 28 Ill. App. 3d 307, 313 (1975).) It has also been held that to be voluntary for the purpose of the assumption of risk defense in products liability litigation a "considered choice" must be involved which cannot be satisfied by "inadvertence, momentary inattention or diversion of attention." *Elder v. Crawley Book Machinery Co.*, 441 F.2d 771, 774 (3d Cir. 1971).

■■ In this case plaintiff's conduct in removing the paper towels without switching off the power took place over a period of a few seconds in the midst of filling a customer's order. The evidence establishes that plaintiff made a split-second decision to reach for the paper towels, while the roast was farthest away from the blade, while standing in front of the machine without turning it off and without conscious thought that the operation of the equipment would thrust her hand almost immediately into contact with the revolving blade. The defendant has the burden of proving the defense of assumption of risk. There was neither direct evidence that plaintiff made an informed and voluntary decision to encounter the obvious risk posed by the unreasonably dangerous machine; nor was there sufficient circumstantial evidence, considering plaintiff's age, experience, knowledge, understanding, the obviousness of the defect and the resulting danger, to permit a jury to draw a reasonable inference that plaintiff made a considered choice to encounter the danger. Therefore, the trial judge properly denied defendant's motion that the plaintiff had assumed the risk as a matter of law, and properly granted plaintiff's motion to find in her favor on the issue as a matter of law.

A number of the cases cited by defendant can be distinguished on the ground that a considered choice was in fact involved. In both *Fore v. Vermeer Manufacturing Co.*, 7 Ill. App. 3d 346, 348-49 (1972), and *Ralston v. Illinois Power Co.*, 13 Ill. App. 3d 95, 97-98 (1973), the plaintiff was held, as a matter of law, to have "assumed the risk." In each case, however, the plaintiff had admitted that he had been well aware of the perils to which he had exposed himself and, in fact, had made numerous complaints to his employer about those risks. In *Williams v. Brown Manufacturing Co.*, 45 Ill. 2d 418, 429-31 (1970), in which it was held that a jury question was created as to assumption of risk, the driver of the trenching machine was injured because of an improperly adjusted drive-belt with evidence that he had recognized and voluntarily accepted the danger. His decision to use the trencher with the improperly adjusted belt was therefore not the result of momentary inadvertence or of a judgment in the matter of seconds as here.

*Denton v. Bachtold Brothers, Inc.*, 8 Ill. App. 3d 1038 (1972), relied upon by the defendant, is distinguishable. Primarily, *Denton* decided that

as a matter of law the rotary lawn mower which caused the plaintiff's injury was not defective or unreasonably dangerous, and therefore did not need to reach the question of whether the defense of assumption of risk was applicable. In dicta, the appellate court commented on the trial court's remarks and noted that it "does not appear" that there is an issue of fact for the jury on the ground of assumption of risk by reason of Denton's own testimony of his acknowledgment of the hazard and the safe way to use the machine. (8 Ill. App. 3d 1038, 1041.) Each case, of course, must be decided on its own particular factual circumstances.

■■ Considerations of public policy compel the same result. Where a design defect consists of a failure to install safety guards to protect users from impulsively reaching into a machine, it would be illogical to deny recovery to a plaintiff whose impulsive action is the very eventuality against which the safety device was to protect. In *Bexiga v. Havir Manufacturing Corp.*, 60 N.J. 402, 290 A.2d 281 (1972), the plaintiff was an 18-year-old operator of a 10-ton power punch press which was without safety devices of any kind. Plaintiff testified that the particular operation required him to place round metal discs about three inches in diameter one at a time on top of the die; he would then depress a foot pedal activating the machine causing a ram to descend about five inches and punch two holes in the disc. The ram would then ascend and equipment on the press would remove the metal disc and blow the trimmings away, with the entire cycle taking about ten seconds. Plaintiff related

> "Well, I put the round piece of metal on the die and the metal didn't go right to the place. I was taking my hand off the machine and I noticed that a piece of metal wasn't in place so I went right back to correct it, but at the same time, my foot had gone to the pedal, so I tried to take my hand off and jerk my foot off too and it was too late. My hand had gotten cut on the punch, the ram." (60 N.J. 402, 406, 290 A.2d 281, 283.)

The New Jersey Supreme Court first held that the absence of protective safety devices on the press created a jury issue as to the presence of a design defect; then held, as a matter of law, that under the circumstances of the case, the plaintiff could not be deemed to have been contributorily negligent[3] stating,

> "We think this case presents a situation where the interests of justice dictate that contributory negligence be unavailable as a defense to either the negligence or strict liability claims.

---

[3] In *Williams v. Brown Manufacturing Co.*, the Illinois Supreme Court recognizes that the test of assumption of risk as used as a defense in strict liability is "substantially narrower than the concept of contributory negligence" (45 Ill. 2d 418, 424); and also notes that other jurisdictions which have adopted the defense in strict liability cases sometimes speak in terms of "contributory negligence" (45 Ill. 2d 418, 426).

The asserted negligence of plaintiff—placing his hand under the ram while at the same time depressing the foot pedal—was the very eventuality the safety devices were designed to guard against. It would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty results in no liability for the very injury the duty was meant to protect against. *Bahlman v. Hudson Motor Car Company*, 290 Mich. 683, 288 N.W. 309 (1939), * * *. We hold that under the facts presented to us in this case the defense of contributory negligence is unavailable." 60 N.J. 402, 412, 290 Mich. 683, 290 A.2d 281, 286.

In *Bahlman v. Hudson Motor Car Co.*, 290 Mich. 683, 288 N.W. 309 (1939), cited in *Bexiga* with approval, the plaintiff's negligence resulted in an automobile accident in which his injuries were aggravated by the fact that the car's roof consisted of two welded parts. There was evidence that the plaintiff had purchased the car relying on the seller's representation that the roof was a "unisteel top." The Michigan Supreme Court, in allowing a recovery by plaintiff, observed that,

"The particular construction of the roof of defendant's cars was represented as protection against the consequences of just such careless driving as actually took place. Once the anticipated overturning of the car did occur, it would be illogical to excuse defendant from responsibility for these very consequences." (290 Mich. 683, 692-93, 288 N.W. 309, 312.)

See also *Jasper v. Skyhook Corp.*, 89 N.M. 98, 101, 547 P.2d 1140, 1143 (N.M. App. 1976).

As a matter of law an employee such as this plaintiff and in the circumstances of this case should not be held to assume the risk created by the absence of a safety device because of her impulsively reaching into an area, from which her hand would be automatically propelled into an area of danger, from which a safety device would have excluded her.

We therefore affirm the judgment of the trial court in case No. 76-407, as well as in case No. 76-408.

Affirmed.

GUILD and RECHENMACHER, JJ., concur.