GEMA LAVAZZI, Adm'x of the Estate of Cayetano Lavazzi, Deceased, Plaintiff-Appellant, v. McDONALD'S CORPORATION, Defendant-Appellee (Weiler and Company *et al.*, Defendants and Third-Party Plaintiffs; Otto and Sons, Inc., Third-Party Defendant).

Second District   No. 2—92—0163

Opinion filed December 31, 1992.

Roy I. Peregrine, of Peregrine, Stime, Newman, Ritzman & Bruckner, Ltd., of Wheaton, and Keith L. Davidson, of Louis G. Davidson & Associates, Ltd., of Chicago, for appellant.

Michael J. Pavlisin and John J. O'Connor, both of McKenna, Storer, Rowe, White & Farrug, of Wheaton, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, Gema Lavazzi, administratrix of the estate of her husband, Cayetano Lavazzi, brought an action against several defendants for the wrongful death of her husband. One of the defendants was McDonald's Corporation (McDonald's). In count IV of her amended complaint, the only count directed against McDonald's, plaintiff alleged that the negligence of McDonald's (hereinafter referred to as defendant) was one of the causes of the death of her husband. After determining as a matter of law that defendant did not owe a duty to plaintiff's deceased (decedent), the trial court granted summary judgment in favor of defendant and ordered that there was no just reason to delay enforcement or appeal. Plaintiff appeals the summary judgment. The issue on appeal is whether defendant owed a legal duty to decedent and whether the trial court properly decided that question as a matter of law by summary judgment.

The relevant facts are as follows. On April 23, 1988, decedent was cleaning and operating a meat mixing and grinding machine (mixer/grinder) in the course of his employment with Otto and Sons, Inc. (Otto). Somehow, decedent got inside the mixer/grinder and was found dead inside the mixer/grinder. When decedent was found, the mixer/grinder was running in the mixing mode. At the time of decedent's death, Otto was a meat products supplier to defendant, a corporation engaged in the management and franchising of restaurants in Illinois and elsewhere.

Defendant and Otto had a close business relationship. Peter Mazza, an employee of defendant, testified during his deposition that Otto had been "McDonaldized." Mazza explained that by this he meant that Otto understood "our culture, they know how to get around within the company, who to talk to, and how to get things done."

Defendant did not have a written contract with Otto. Otto was one of only five United States suppliers of ground beef patties and other meat products to defendant. Otto was the exclusive supplier of these meat products to defendant's franchisees within a designated area of the country. Defendant was Otto's only customer. Defendant purchased Otto's entire output.

Defendant required Otto to meet and maintain certain standards with respect to the quality of the meat products defendant purchased

from Otto. Defendant required Otto to supply only wholesome, high-grade meat; to deliver the meat in a certain specific condition; to maintain certain standards of cleanliness; and to conduct its operation in a manner to maintain the quality and safety of the meat products.

Defendant monitored the quality of the meat products it purchased from Otto in several ways. Among the ways defendant monitored Otto was through periodic quality assurance reviews, sanitation audits, and supplier status reports. Defendant generally refers to these monitoring activities as audits. Some of the audits occurred at Otto's plant.

Pretrial discovery disclosed records of three audits in defendant's files. The earliest of these audit records was a quality assurance review report. Paul Simmons, employed by defendant as a quality assurance supervisor, drafted the report in 1985. The report consists of two, single-spaced typewritten pages containing about 23 separate items of information. Plaintiff cites two of the items in the report. The first item states "[t]he equipment is in good working order and maintenance staff are very knowledgeable of equipment." The second item states "[m]anagement could spend more time on the production floor to review product and equipment, as well as spending more time with the employees at their work stations. Field Service could also benefit by spending some time on the production floor."

The second audit report found in defendant's files was a sanitation audit report. Simmons also prepared this report. The sanitation audit report was a summary of a meeting at Otto's plant on September 24, 1987, which was attended by Simmons and eight other people including Otto's plant supervisor and other Otto employees. The information in the sanitation audit report could have come from either the defendant's employees or Otto's employees who attended the meeting. The report consists of three typewritten pages. The first item in the report is a statement showing that the purpose of the meeting was to "Review the sanitation program and determine the level of food safety at the facility." The specific evidence plaintiff points to in this sanitation audit report is a statement that the "Plant is equipped with electrical lockouts including lighted indicators for employee safety." Plaintiff also notes that the report lists one of the benefits of reducing high pressure and increasing nozzle size as "Safety."

The third audit report found in defendant's files was a plant visit and supplier status report dated December 13, 1988 (nearly eight months after the incident in question here). Plaintiff notes that the report, under the heading "Plant Requirements and Recommendations," contains the following statement:

"General GMP's [Good Manufacturing Practices] and attention to detail were lacking. Examples—Production Supervisors were not wearing hair nets or beard nets, they were wearing watches and jewelry. Tools were laying [sic] on equipment with no holders or safety precautions. Broken Combo's in cooler, bloody floor. Large cage [sic] of alcohol in production cooler (Christmas gifts). In general, plant was not its usual quality condition."

In addition to the audit reports, plaintiff notes that the sign outside Otto's plant shows that Otto & Sons are "PROCESSORS OF MEAT PRODUCTS FOR McDONALDS." The sign also contains defendant's logo, the golden arches.

Plaintiff contends that the foregoing facts are sufficient to show that, or at least raise a question of fact whether, defendant had a legal duty to exercise due care in guarding against injury to decedent during the course of decedent's employment with Otto. Plaintiff argues that this duty arose from defendant's voluntary undertaking of the duty or from defendant's total control of Otto and Otto's plant.

Defendant denies that it had total control of Otto or Otto's plant. Defendant asserts that it had a business relationship with Otto in which it purchased goods from Otto but did not control Otto. Defendant specifically points to the fact that it never required or directed Otto to use a certain type of mixer/grinder at its plant. Defendant also notes that it is undisputed that defendant did not participate in the design, purchase, or installation of the mixer/grinder and that there is no evidence showing defendant ever inspected the mixer/grinder.

Defendant asserts that plaintiff has not shown a voluntary undertaking of a duty by defendant for the safety of Otto's employees. Defendant contends that the 1985 quality assurance review report drafted by Simmons was a compilation of information obtained from several sources. These sources included Simmons' visits to Otto's plant as well as observations from other employees of the defendant, restaurant licensees, and other suppliers. Defendant argues that the information was only used to monitor the quality of the meat product and plant sanitation.

Defendant further contends that the sanitation audit report also contained information from several sources. Defendant notes that the report was based on a combination of observations and information from all those in attendance at the September 24, 1987, meeting, including five of Otto's employees. Defendant maintains that the observation about the electric lockouts was most likely made by the clean-

ing specialist in attendance at the meeting or one of Otto's employees. Defendant notes that Simmons' only responsibility during a sanitation audit was to check the quality of the meat product and that Simmons did not check to see if the equipment was in good working order. Finally, defendant notes that Joseph Zeisberger, Otto's plant engineer since 1973, is responsible for maintaining all the mechanical systems and equipment at Otto's plant.

Defendant asserts that whether it owed a duty to decedent is a question of law properly decided by a trial court. Defendant argues that the trial court properly ruled that it owed no duty to decedent and therefore properly granted its motion for summary judgment.

A court should grant a motion for summary judgment when the pleadings, depositions, admissions and affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. (See Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c).) Thus, summary judgment is proper when a court may determine an issue as a question of law. *Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 421.

While the goal of expeditious disposition of a lawsuit by the use of summary judgment is encouraged, it is a drastic means to disposing of litigation and should only be allowed when the right of the moving party is clear and free from doubt. (*Loyola Academy v. S & S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 271.) Accordingly, a court ruling on a motion for summary judgment must strictly construe the evidence against the movant and liberally in favor of the nonmoving party. *Logan v. Old Enterprise Farms, Ltd.* (1990), 139 Ill. 2d 229, 234.

Nonetheless, in order to survive a motion for summary judgment, the nonmoving party must come forward with evidence establishing a genuine issue of fact. (*Hotze v. Daleiden* (1992), 229 Ill. App. 3d 301, 305.) Summary judgment in favor of a defendant is proper where a plaintiff has not established an essential element of a cause of action. (*Gresham v. Kirby* (1992), 229 Ill. App. 3d 952, 954-55.) One of the essential elements of an action for negligence which the plaintiff must set out is the existence of a duty owed by the defendant to the plaintiff. *Vesey v. Chicago Housing Authority* (1991), 145 Ill. 2d 404, 411.

Here, plaintiff concedes that there is no independent duty in Illinois or at common law for a buyer of goods such as defendant with respect to the safety of the employees of the supplier of the goods. However, plaintiff claims that defendant voluntarily undertook a duty of care for the safety of Otto's employees and that this duty extended to decedent. In addition, plaintiff claims that defendant exercised such

total control of Otto that defendant's control of Otto gave rise to a duty for defendant to guard against injury to Otto's employees. We will first consider the voluntary undertaking claim.

■ Liability can arise from the negligent performance of a voluntarily undertaken duty. (*Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 209.) Whether a defendant has voluntarily undertaken a legal duty to a plaintiff seeking to bring a negligence action must be determined by a court as a question of law and is properly addressed by the court on a motion for summary judgment. *Morgan v. 253 East Delaware Condominium Association* (1992), 231 Ill. App. 3d 208, 211-12.

■ Based upon the foregoing principles of law, we find that a review of the facts of this case supports the trial court's grant of summary judgment in favor of defendant. We agree with the circuit court that as a matter of law, defendant did not voluntarily undertake a legal duty of care for decedent's safety. Construing the evidence in the record liberally in plaintiff's favor clearly shows that defendant did not undertake a duty to care for the safety of Otto's employees. While it could be argued that strictly construing the references to safety in defendant's audit reports shows that the defendant had some concern for the safety of Otto's workers, the record as a whole does not support an inference that defendant undertook a duty of care for their safety. Defendant limited its monitoring of Otto to audits intended to insure that the products it purchased from Otto met its sanitation standards and was safe for its consumers. Defendant's employees testified that defendant never conducted worker safety inspections at Otto's plant. The testimony of Otto's employees agreed. Otto's plant manager testified she was responsible for worker safety at the plant and she never discussed this with any of defendant's employees. Defendant certainly never inspected the mixer/grinder in question. The design, selection, installation, modification and maintenance of the mixer/grinder was done by or under the supervision of Otto's employees without input from defendant. Based on the record as a whole, we find that as a matter of law defendant did not voluntarily undertake a duty to care for the safety of Otto's employees including decedent.

Plaintiff's reliance on *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, is misplaced. In *Nelson,* our supreme court, construing Florida law, held that the defendant insurance company's gratuitous safety inspections and safety engineering services with respect to a hoist on a construction site gave rise to a duty to plaintiff construction workers. (*Nelson,* 31 Ill. 2d at 83.) The plaintiffs were employees

of the insured general contractor and various subcontractors. Seven of the plaintiffs were killed and thirteen others severely injured when the hoist cable broke and the hoist carrying the plaintiffs plunged six floors to the ground. In reaching its conclusion, the *Nelson* court specifically noted: (1) that defendant had repeatedly advertised that it provided safety engineering services which could increase an insured's worker safety and lower an insured's costs; (2) that defendant's safety engineer, a qualified elevator inspector, made frequent safety inspections which included careful inspection of the hoist which he knew was used as an elevator by the construction workers; (3) that defendant's safety engineer filed reports of his safety inspections with defendant and the insured and the reports specifically mentioned the hoist and sometimes included recommendations for changes to improve safety; and (4) that the insured relied on defendant's safety inspections and did not employ a safety engineer or safety inspector of its own. *Nelson*, 31 Ill. 2d at 79-83.

Here, plaintiff posits on appeal that defendant's conduct was similar to the defendant's conduct in *Nelson* and even went far beyond the conduct in *Nelson*. We disagree. In this case, defendant did not hold itself out to Otto as a provider of safety engineering services or safety inspections. While defendant established sanitation standards for the product it purchased from Otto and monitored the product to insure these standards were met, the record shows that defendant did not make safety inspections of Otto's plant to insure worker safety there. At most, the audit reports in the record indicate that defendant occasionally took note of limited worker safety considerations. In addition, the record clearly shows that defendant, unlike the *Nelson* defendant, did not specifically focus any attention during its audits on the piece of equipment involved in the injury. This case is also different than *Nelson* because Otto had its own safety personnel and procedures including a plant engineer whose duties included safety inspections of the machinery in the plant. In contrast, Simmons, defendant's employee who drafted two of the audit reports, was not a safety inspector or engineer of any kind. Finally, this case is different from *Nelson* in that the record shows that Otto did not rely on defendant for employee safety. Otto's plant supervisor testified during her deposition that she was in charge of employee safety throughout the plant, that she frequently met with defendant's employees, but that she had never discussed the safety of Otto's employees with any of defendant's employees.

Based on the foregoing, we conclude that defendant did not voluntarily undertake a duty to guard against injury to Otto's employees.

We find that the circuit court properly decided this issue as a question of law.

■ We next consider plaintiff's claim that defendant exercised total control of Otto or Otto's plant and that this control gave rise to a duty for defendant to care for the safety of Otto's employees. Plaintiff first repeats its contentions that defendant's audit reports show that defendant conducted safety inspections and expected Otto to conform its conduct to the standards and recommendations contained in the audit reports. As seen above, the evidence in the record does not support these contentions. There is no evidence that defendant made worker safety inspections. There is no evidence that defendant made recommendations concerning Otto's workers' safety. The 1985 quality assurance review report simply notes that the equipment is in good working order, the maintenance staff is knowledgeable about the equipment, and that management could spend more time on the production floor. When viewed in the context of the entire report, these statements do not show that defendant controlled Otto but are simply observations made in support of a product quality review. Similarly, the 1987 sanitation audit report merely notes that the plant is equipped with electrical lockouts and lighted indicators for employee safety. This statement does not show that these devices were inspected and does not make any recommendation regarding them. In the context of the entire report, the statement is merely a detailed observation made in an overall general observation of the plant's equipment with respect to sanitation. The plant visit and supplier status report was dated December 13, 1988, nearly eight months after the incident in question here. The report merely listed several facts to support its conclusion that the plant was not in its usual quality condition. This statement was made in the context of product quality, not worker safety. Contrary to plaintiff's assertions, we find that none of the audit reports either individually or cumulatively supports an inference that defendant controlled Otto or the safety of Otto's employees.

■ Plaintiff next contends that defendant's "complete right to control" Otto is evidenced by the nature of Otto's business relationship with defendant. Plaintiff points to the fact that defendant was Otto's only customer, posits that defendant therefore had the power to determine Otto's very survival, and concludes that defendant "possessed complete economic control" of Otto.

We find plaintiff's reasoning unpersuasive. Except for the fact that defendant is Otto's only customer, plaintiff's analysis is purely speculative. Plaintiff does not provide any authority for her position that a customer who purchases the entire output of a supplier there-

fore necessarily controls the supplier. Nor does plaintiff provide any authority for her contention that if a customer has economic control of a supplier, then the customer is responsible for the supplier's workers' safety.

Plaintiff's reliance on *Martin v. McDonald's Corp.* (1991), 213 Ill. App. 3d 487, is inapposite. In *Martin*, the defendant licensor controlled one aspect of its licensee's operation—security. The *Martin* court concluded that by its control of the licensee's security procedures the defendant voluntarily undertook to provide for the security of its licensee's employees and that a duty to provide security thus arose. (*Martin*, 213 Ill. App. 3d at 492.) In reaching this conclusion, the court noted that defendant's regional security supervisor acted directly as the security supervisor of the licensee, that the licensee did not have an operations manager or security supervisor of its own, and that defendant provided detailed security procedures to be followed by the licensee's employees. (*Martin*, 213 Ill. App. 3d at 491-92.) In this case, none of defendant's employees acted as direct supervisors of Otto's employees, Otto had its own safety personnel and procedures, and all of the safety procedures to be followed by Otto's employees came from Otto's safety supervisors.

Based on the foregoing, we conclude that plaintiff's claim that defendant controlled Otto because of defendant's economic relationship with Otto is without merit. Furthermore, assuming, *arguendo*, that defendant did exercise economic control of Otto, plaintiff has failed to show that this gave rise to a duty for defendant to guard against injury to Otto's employees. Plaintiff has also failed to show that defendant specifically controlled Otto's safety procedures. The record clearly shows that Otto exercised independent control of its workers' safety. Finally, we are guided by a recent supreme court decision which took a narrow construction of an alleged voluntary undertaking of duty on public policy grounds. (*Frye v. Medicare-Glaser Corp.* (1992), 153 Ill. 2d 26.) We believe there are public policy grounds for taking a narrow construction of any assumption of duty by control in this case. The public policy concern is that such a precedent could lead to a result where any buyer who purchased the entire output of a supplier would necessarily be held responsible for the safety of the supplier's workers.

■ Plaintiff's last contention with respect to defendant's alleged control giving rise to a duty concerns Otto's use of defendant's name and logo (the golden arches) on its outdoor sign. Plaintiff does not cite any authority to support its contention that Otto's use of defendant's name and logo is tantamount to control by defendant.

Defendant argues that the situation is analogous to franchisor-franchisee cases which hold that when a franchisee uses the franchisor's logo it does not necessarily mean that the franchisor controls the franchisee. These cases and the related independent contractor cases generally hold that when a franchisee which uses a franchisor's logo or an independent contractor which uses an employer's logo retains day-to-day control of operations such as hiring and firing employees, payroll, worker's compensation insurance, and taxes, then the franchisee or independent contractor is deemed to control itself and therefore to be liable for its worker's safety and the franchisor or employer of the independent contractor is not liable. (*Coty v. U.S. Slicing Machine Co.* (1978), 58 Ill. App. 3d 237, 240-42.) A right to rescind a contract or call off the work is generally insufficient to establish control and impose liability for workers' safety under either the franchisee or employer-independent contractor theories. *Coty*, 58 Ill. App. 3d at 242.

Here, the record does not specifically categorize the relationship between defendant and Otto. There is nothing to show that defendant is a franchisor of Otto. The relationship is more in the nature of an employer-independent contractor. The question then becomes whether defendant had control over Otto's day-to-day operations. The record shows that defendant did not have such control. Defendant's employees testified that the purpose of their audits was to insure that the quality of the product met defendant's standards. There is nothing in the record to show that defendant had any control over Otto's day-to-day operations such as hiring and firing employees, payroll, worker's compensation, or taxes. This is supported by the testimony of Otto's plant manager. We therefore conclude that defendant did not have control of Otto despite the fact that Otto used defendant's name and logo on its outdoor plant sign. The fact that Otto may have been "McDonaldized" does not change our conclusion.

For all the above reasons, we conclude that defendant did not control Otto or Otto's employees' safety and therefore did not have a duty of care for the safety of Otto's workers, including decedent. This question was correctly decided by the circuit court as a matter of law.

The circuit court grant of summary judgment in favor of defendant is affirmed.

Affirmed.

WOODWARD and McLAREN, JJ., concur.