Robert BROWN, Janet Diaz and John Welling, Plaintiffs–Appellants,

v.

SEARS, ROEBUCK & COMPANY, Defendant–Appellee.

No. 03–4289.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 2004.

Decided Dec. 23, 2004.

William J. Harte, Harte & Associates, Chicago, IL, for Plaintiffs–Appellants.

James C. Schroeder, Mayer, Brown, Rowe & Maw, Chicago, IL, for Defendant–Appellee.

Before MANION, ROVNER, and WOOD, Circuit Judges.

ORDER

Robert Brown, Janet Diaz, and John Welling sued their employer, Diamond Exteriors, Inc., a subsidiary of Diamond Home Services, Inc. (collectively, "Diamond"), raising various compensation-related claims under federal and state law after Diamond went out of business. The plaintiffs also sued Diamond's only client, Sears, Roebuck and Company ("Sears"). The dispute in this appeal is whether the employees of Diamond, an independent contractor, were also the employees of Sears. The district court granted Sears summary judgment, concluding that, because Sears was not the plaintiffs' employer, it was not liable. The plaintiffs appeal. We affirm.

I.

Plaintiffs Brown, Diaz, and Welling worked for Diamond until it went out of business in 2000. Little else about the

plaintiffs' employment duties is of record in this case. Instead, their complaint concentrates on their employer and its relationship with Sears. Diamond, founded by several former Sears employees as a home improvement firm, entered into a licensing agreement with Sears in 1996. For a fee, Sears licensed Diamond to sell and install home improvements such as roofs, gutters, fences, and garage doors, using the "Sears" brand name. The licensing agreement ("licensing agreement" or "agreement") governed the contractual relationship between the two companies. The agreement expressly stated that Diamond was an "independent contractor" and that "[n]othing contained in or done pursuant to [the agreement] shall be construed as creating a partnership, agency . . . or joint venture." Lic. Agmt. at ¶ 8. While Sears had other contractors in addition to Diamond for these home improvement services, Diamond served as the exclusive contractor for each of its local markets, which were scattered throughout the country. Diamond did not operate its home improvement business under any name other than Sears.

Diamond employed approximately 1,500 employees. In addition to sales and installation people, Diamond had clerical and administrative staffs, including employees in accounting, human resources, and legal departments. The agreement explicitly stated that Diamond had "no authority to employ persons on behalf of Sears and no employees of [Diamond] shall be deemed to be employees or agents of Sears, said employees at all times remaining [Diamond] employees." *Id.* at ¶ 6(A). In keeping with that provision, Diamond exclusively controlled employee wages, hours, and working conditions and had the sole right to hire, fire, transfer, discipline, and otherwise manage Diamond employees.

Through a number of regulatory provisions in the agreement, Sears influenced Diamond's performance under the agreement. Sears approved and provided a number of materials used by Diamond, such as sales materials, credit materials, and advertising materials. Sears further used customer surveys, inspections, audits, periodic meetings, and frequent telephone conversations to monitor Diamond's adherence to quality standards set by Sears. The monitoring led Sears to occasionally make suggestions to Diamond about the performance of certain Diamond employees, including an occasional recommendation that a particular employee be fired. But, as mandated by the agreement, the ultimate decision on such matters always rested with Diamond. Nonetheless, continued poor performance by Diamond could lead to Sears pulling a certain local market from Diamond or terminating the entire agreement.

The contractual relationship under the agreement existed, with minor modifications, until 2000 when Sears terminated the agreement and Diamond ceased operations. Thereafter, the plaintiffs sued Diamond raising a number of compensation-related claims.[1] In the same action, the plaintiffs also named Sears as a defendant alleging unjust enrichment, conversion, vi-

---

1. The district court proceedings addressed a number of complex matters that are beyond the scope of this narrow appeal regarding Sears. Those additional matters involved the Employee Retirement Income Security Act and concerned parties not present here on appeal. Those additional matters gave the district court subject matter jurisdiction over most of the plaintiffs' claims. *See* 28 U.S.C. § 1331; 28 U.S.C. § 1335; 29 U.S.C. § 1132(e)(1). The district court had supplemental jurisdiction over the remainder of the plaintiffs' claims. *See* 28 U.S.C. § 1367(a). The only claims at issue on appeal are supplemental state law claims against Sears.

olations of the Illinois Wage Payment and Collection Act, and breach of contract. The district court granted Sears summary judgment on the conversion claim, and the plaintiffs do not challenge that ruling on appeal. The district court also granted Sears summary judgment on the three remaining claims, concluding that there was no employer-employee relationship between Sears and the plaintiffs. The district court entered a partial judgment, pursuant to Federal Rule of Civil Procedure 54(b), in favor of Sears. The plaintiffs appeal.[2]

## II.

We review the district court's grant of summary judgment de novo, construing all facts in favor of the non-moving party. *See Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1011 (7th Cir.2004). Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In short, summary judgment is warranted when "a rational

trier of fact could not find for the non-moving party." *Little*, 369 F.3d at 1011.

It is undisputed that, to prevail under Illinois law on their three remaining claims against Sears—unjust enrichment, Illinois Wage Payment and Collection Act violations, and breach of contract—the plaintiffs must prove that an employer-employee relationship existed between Sears and the plaintiffs. The plaintiffs do not attempt to establish the existence of this relationship by pointing to facts about their own interactions with Sears. Indeed, the plaintiffs have neglected to present any evidence concerning their individual employment circumstances. For instance, the plaintiffs have not disclosed who supervised them, how they were supervised, the Diamond location where they worked, the nature of their responsibilities, or whether they had any contact at all with Sears in performing their duties for Diamond. Rather, the plaintiffs attempt to establish the relationship by taking an all-or-nothing approach: they argue that *all* Diamond employees were also Sears employees and that, since they themselves were Diamond employees, they were thus Sears employees.

In Illinois, "there is no rigid rule of law governing the determination of whether an employer-employee relationship exists." *Netzel v. Indus. Comm'n*, 286 Ill.App.3d 550, 221 Ill.Dec. 749, 676 N.E.2d 270, 273 (1997); *see also Hills v. Bridgeview Little League Ass'n*, 195 Ill.2d 210, 253 Ill.Dec. 632, 745 N.E.2d 1166, 1182 (2000); *Ware v. Indus. Comm'n*, 318 Ill.App.3d 1117, 252

---

**2.** The plaintiffs brought this action as a class action, but the district court disposed of the plaintiffs' claims against Sears without making a class certification ruling. Given the dispositive ruling at hand and the fact that the district court did not specifically reserve the class certification issue for later determination, the absence of a class certification ruling does not affect this court's jurisdiction in re-

viewing a final judgment. *See Harold Wash. Party v. Cook County, Ill. Democratic Party*, 984 F.2d 875, 878–79 (7th Cir.1993); 28 U.S.C. § 1291. The scope of the judgment being appealed does not affect possible class members. We treat the claims in question as being brought solely by the three named plaintiffs against the named defendant. *See Harold Wash. Party*, 984 F.2d at 878–79.

Ill.Dec. 711, 743 N.E.2d 579, 583 (2000). Nonetheless, here, as is repeatedly the case, the preeminent and dispositive consideration is *control:* specifically, whether the purported employer controls or has the right to control the purported employee's physical conduct in performing the services at issue. *See Hills,* 253 Ill.Dec. 632, 745 N.E.2d at 1182; *Bob Neal Pontiac–Toyota, Inc. v. Indus. Comm'n,* 89 Ill.2d 403, 60 Ill.Dec. 636, 433 N.E.2d 678, 680–81 (1982); *Ware,* 252 Ill.Dec. 711, 743 N.E.2d at 583.

We first turn to the licensing agreement, which made it emphatically clear that Diamond was an independent contractor, not some sort of partner or agent of Sears with shared employees. *See Castro v. Brown's Chicken & Pasta, Inc.,* 314 Ill. App.3d 542, 247 Ill.Dec. 321, 732 N.E.2d 37, 46 (2000); *Slates v. Int'l House of Pancakes, Inc.,* 90 Ill.App.3d 716, 46 Ill. Dec. 17, 413 N.E.2d 457, 461, 465 (1980). More important, the agreement unequivocally stated that "no employees of [Diamond] shall be deemed to be employees or agents of Sears." Lic. Agmt. at ¶ 6(A). Other provisions in the agreement underscored this contractual relationship: Diamond, not Sears, controlled employee wages, hours, and working conditions, and Diamond, not Sears, had the sole right to hire, fire, transfer, discipline, and otherwise manage Diamond employees. While the agreement alone is not conclusive, *see Ware,* 252 Ill.Dec. 711, 743 N.E.2d at 583; *McConnell v. Freeman United Coal Co.,* 198 Ill.App.3d 322, 144 Ill.Dec. 474, 555 N.E.2d 993, 996 (1990), the agreement nonetheless provides a strong indication that only Diamond had the right to control Diamond employees, and, as will be discussed below, the reality of the situation was in accordance with these provisions of the agreement.

To circumvent the explicit terms of the agreement, the plaintiffs point to a morass of information regarding the Sears–Diamond relationship, which the plaintiffs contend provides sufficient evidence of control by Sears for the employer-employee relationship question to be put to the jury. The plaintiffs' evidence can be grouped into three categories: (1) participation in employment decisions (e.g., firing), (2) monitoring of performance, and (3) approval and provision of materials. We will address each in turn.

A.

As to participation in employment decisions: the power to fire an employee is one of the hallmarks of the control possessed by employers. *See Shoemaker v. Elmhurst–Chicago Stone Co.,* 273 Ill. App.3d 916, 210 Ill.Dec. 61, 652 N.E.2d 1037, 1040–41 (1995); *Lavazzi v. McDonald's Corp.,* 239 Ill.App.3d 403, 179 Ill.Dec. 1013, 606 N.E.2d 845, 852 (1992); *Yassin v. Certified Grocers of Ill., Inc.,* 150 Ill.App.3d 1052, 104 Ill.Dec. 52, 502 N.E.2d 315, 328 (1986). The plaintiffs argue that Sears had de facto power to fire Diamond employees. The plaintiffs' star witness, Michael Burchfield, a former Diamond marketing executive, stated that "[m]any Diamond employees were fired pursuant to [Sears's] instructions." Burchfield Aff. at ¶ 35. However, Burchfield's definition of the word "instructions" shows that the "instructions" were actually suggestions or recommendations that left the ultimate determination in the hands of Diamond. According to Burchfield, Sears never told Diamond that a certain employee must be fired; rather, Sears simply *"advised* Diamond that certain [employees] were not performing . . . and *should be* fired." *Id.* (emphasis added); *see also* Burchfield Dep. at 295 (Sears indicated to Burchfield: *"you're responsible* to fire them" (emphasis added)); *see also id.* at 296 ("Sears was

always cautious to *not use* the word *'fire'*" (emphasis added)). The plaintiffs' other witness, R.Q. Whitmire, a former Diamond sales executive, concurred in Burchfield's assessment. When asked if he was ever personally told by Sears to terminate a specific Diamond employee, he responded as follows: "Direct statement, terminate that employee? ... No." Whitmire Dep. at 162. When further asked if Sears ever *"recommended"* that an employee be terminated or *"indirectly* told" him to terminate an employee, Whitmire answered in the affirmative. *Id.* (emphasis added); *see also id.* at 108, ("I don't want you to think they walked in and said, you need to terminate [John Doe] today."). Sears's indirect, advisory role is confirmed by the fact that Diamond had a record of rejecting Sears's recommendations. The plaintiffs were able to identify only six Diamond employees whom Sears had requested be discharged, and, of the six, Diamond refused to fire three. Moreover, Diamond actually promoted one of the three that it retained. The record therefore demonstrates that Diamond, and only Diamond, could fire Diamond employees and that Diamond, and only Diamond, did fire Diamond employees.

Plaintiffs also point to the fact that Diamond occasionally hired or transferred employees with input from Sears. The evidence nonetheless shows that, as with the firings, Sears's actions in these matters amounted to nothing more than suggestions or recommendations. The mere act of making a suggestion or recommendation does not equate to the level of control necessary to establish an employer-employee relationship because such "suggestions or recommendations which need not necessarily be followed" do not alter the salient fact that, no matter what Sears said, Diamond always made the final decision. *Martens v. MCL Constr. Corp.,* 347 Ill.App.3d 303, 282 Ill.Dec. 856, 807 N.E.2d

480, 489 (2004); *Castro,* 247 Ill.Dec. 321, 732 N.E.2d at 45; *Coty v. U.S. Slicing Mach. Co.,* 58 Ill.App.3d 237, 15 Ill.Dec. 687, 373 N.E.2d 1371, 1376 (1978); *see also Shoemaker,* 210 Ill.Dec. 61, 652 N.E.2d at 1041; *Yassin,* 104 Ill.Dec. 52, 502 N.E.2d at 328. Thus, the fact that Sears made such non-binding suggestions or recommendations about firing, hiring, and transferring does not show that Sears was an employer of Diamond employees.

Additionally, the plaintiffs complain that, even if Sears could not force Diamond to follow its employment recommendations, Sears had leverage over Diamond in that it could pull a local market from Diamond or even terminate the entire licensing agreement. Illinois courts, however, have consistently held that the "right to rescind a contract ... is generally insufficient to establish control." *Lavazzi,* 179 Ill.Dec. 1013, 606 N.E.2d at 852; *see also Castro,* 247 Ill.Dec. 321, 732 N.E.2d at 45; *Coty,* 15 Ill.Dec. 687, 373 N.E.2d at 1376. Therefore, Sears's general right to cease doing business with Diamond does not show that Sears had control over Diamond employees.

## B.

The plaintiffs also contend that Sears's oversight of Diamond's performance is evidence of control. The employment recommendations discussed above generally resulted from Sears monitoring the quality of Diamond's performance in the areas of sales, installation, and servicing, as measured by Sears's standards. These standards, which were mandated by the licensing agreement, included such common-sense items as answering the telephone promptly, dressing neatly, taking accurate measurements on job sites, and keeping customers informed about job progress. The plaintiffs maintain that the imposition

of such standards on Diamond, as well as the monitoring of Diamond under those standards, shows that Sears exercised sufficient control over Diamond employees to render Sears their employer.

As to the imposition of standards on Diamond, such action does not create an employer-employee relationship between Sears and Diamond employees. The situation is similar to that of a franchisor-franchisee relationship. The franchisor (and here the licensor) puts its brand name, and the goodwill earned with that name, on the line by allowing the franchisee and its employees to do business with that brand name. As a consequence, it is exceedingly reasonable for the franchisor (or licensor) to use contractual measures to protect itself and reduce the risk of the franchisee and its employees tarnishing or otherwise harming the franchisor, its name, and its business. Which is why, in Illinois, a franchisor may impose quality guidelines or standards on a franchisee without automatically becoming the employer of the franchisee's employees. *See Castro,* 247 Ill.Dec. 321, 732 N.E.2d at 41, 45; *Lavazzi,* 179 Ill.Dec. 1013, 606 N.E.2d at 850–52; *Yassin,* 104 Ill.Dec. 52, 502 N.E.2d at 327–28; *Slates,* 46 Ill.Dec. 17, 413 N.E.2d at 465–66; *Coty,* 15 Ill.Dec. 687, 373 N.E.2d at 1374–75. Thus, just because Sears prescribed standards for Diamond's performance does not mean that Sears controlled Diamond employees.

Likewise with monitoring, the measurement of Diamond's adherence to quality standards did not put Sears in control of Diamond employees. Sears evaluated Diamond's performance through customer surveys, post-installation inspections, and audits of field offices, and Sears reviewed the results of these measures, as well as customer complaints, with Diamond through periodic meetings and frequent phone conversations with Diamond manag-

ers. In Illinois, the right "to inspect [a franchisee or independent contractor's] progress or to receive reports" about such progress "does not mean that [the franchisee or] the contractor [or the employees of either are] controlled" by the franchisor or the client of the contractor. *Martens,* 282 Ill.Dec. 856, 807 N.E.2d at 489 (internal quotation omitted), *see also Castro,* 247 Ill.Dec. 321, 732 N.E.2d at 41, 45; *Lavazzi,* 179 Ill.Dec. 1013, 606 N.E.2d at 850–52; *Yassin,* 104 Ill.Dec. 52, 502 N.E.2d at 327–28; *Slates,* 46 Ill.Dec. 17, 413 N.E.2d at 465–66; *Coty,* 15 Ill.Dec. 687, 373 N.E.2d at 1374–75. This is true even if those reports are daily, as was the case here during the later stages of the Sears–Diamond relationship. *See Richardson v. Bulk Petroleum Corp.,* 11 Ill.App.3d 655, 297 N.E.2d 405, 406–08 (1973). Further, the Sears review process was focused on Diamond's results (e.g., the qualitative results generated by the customer surveys, the response to customer complaints, the return on licensing fees), and not the details of how Diamond employees achieved those results. *See, e.g.,* Burchfield Dep. at 216 ("[O]ften [Sears] didn't want to get into the details. They just wanted results. And that's all they were after[—]the results."). Thus, the management of Diamond employees (e.g., the direction of which tasks to perform, the determination of wages) was left to Diamond. The fact that Sears had the right to monitor and direct the results to be achieved by Diamond is not enough to establish an employer-employee relationship between Sears and Diamond employees. *See Castro,* 247 Ill.Dec. 321, 732 N.E.2d at 45; *Shoemaker,* 210 Ill.Dec. 61, 652 N.E.2d at 1041; *Lavazzi,* 179 Ill.Dec. 1013, 606 N.E.2d at 852; *Yassin,* 104 Ill.Dec. 52, 502 N.E.2d at 328–29; *Slates,* 46 Ill.Dec. 17, 413 N.E.2d at 465–66; *Coty,* 15 Ill.Dec. 687, 373 N.E.2d at 1374–75; *cf. Hojnacki v. Klein–Acosta,* 285 F.3d 544, 551 (7th

Cir.2002) (federal law) ("For an employer-employee relationship to exist, however, the employer must have the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved." (internal quotation omitted)).

Of course, continued poor performance by Diamond could cause Sears to pull a local market from Diamond or terminate the entire licensing agreement; however, as discussed above the right to terminate a contract alone is insufficient to establish control over another entity and its employees. *See Castro*, 247 Ill.Dec. 321, 732 N.E.2d at 45; *Lavazzi*, 179 Ill.Dec. 1013, 606 N.E.2d at 852; *Coty*, 15 Ill.Dec. 687, 373 N.E.2d at 1376. Therefore, though Sears did indeed have a degree of indirect influence over Diamond employees through the review of Diamond's performance, this influence came nowhere close to the level of controlling the physical details of Diamond employees' daily work because the management of the employees was the exclusive province of Diamond. *Cf. Slates*, 46 Ill.Dec. 17, 413 N.E.2d at 466 ("While we agree with the plaintiff that the agreement gives the [franchisor] a high degree of supervision over the methods and operations of [the franchisee], our examination of the agreement indicates that this control was not so all encompassing as to negate the express intention of the parties in the franchise agreement that no agency relationship was created."). Accordingly,

monitoring the quality of Diamond's performance by Sears did not create an employer-employee relationship between Sears and Diamond employees.[3]

## C.

The plaintiffs further claim that Sears exercised control by providing and approving materials used by Diamond employees. The items at issue included scripts for telephone operators, training materials for new salespeople, sales material for customers, credit applications, and similar forms. The "Sears" brand name appeared on or was utilized in such items. Similarly, advertising materials created by Diamond, all of which bore the "Sears" name, were approved by Sears. Also, much like large franchisors, Sears did some of the advertising for the home improvement services directly on its own. Further, Sears owned the customer information and telephone numbers used by Diamond.

These facts do not support the plaintiffs' position. A licensor (like a franchisor) does not create an employment relationship by approving materials with its name or logo on them or supplying a fraction of the materials or tools used by the licensee (or franchisee) and its employees. Under a contrary rule, large franchisors would be held to be the employers of every person working in its franchised outlets, and that is not the case in Illinois. *See Lavazzi*, 179 Ill.Dec. 1013, 606 N.E.2d at 851–52; *Slates*, 46 Ill.Dec. 17, 413 N.E.2d at 464–66 ("The mere licensing of a trade name does

---

**3.** Even if Sears were deemed to be in control of some Diamond employees as a result of the review process, the employees affected would be limited to Diamond's sales and installation people, as well as a handful of Diamond managers, such as Burchfield and Whitmire. Consequently, large portions of Diamond's clerical and administrative workforce (e.g., the human resources department) would not be under Sears's control. This distinction is fatal to the plaintiffs' claims because, as discussed above, the plaintiffs did not introduce evidence concerning their individual employment circumstances. As plaintiffs' counsel reiterated at oral argument, all of Diamond's employees (approximately 1,500) should be considered Sears employees, regardless of their job duties. Apparently, that is the reason why the duties of the three plaintiffs are not disclosed. So the sum of their all-or-nothing strategy has to be nothing.

not create an agency relationship."); *Coty,* 15 Ill.Dec. 687, 373 N.E.2d at 1374–75. Additionally, with respect to credit materials, Diamond used Sears credit materials when customers made purchases with a Sears credit card, just as they used Visa materials for a Visa charge, MasterCard materials for a MasterCard charge, and American Express materials for an American Express charge. Such utilization does not mean that Sears, Visa, MasterCard, and American Express were the employers of Diamond employees. *See Graves v. Women's Prof'l Rodeo Ass'n,* 907 F.2d 71, 73 (8th Cir.1990). In short, the provision and approval of materials and tools in this case does not establish the existence of an employer-employee relationship between Sears and Diamond employees.

### III.

In sum, under the licensing agreement, Sears exerted influence over Diamond, and thus indirectly over Diamond employees; however, this indirect influence did not amount to the type of control exerted by an employer over employees because the details of employee management, and the exercise of discretion associated therewith, were always left in the exclusive hands of Diamond. As the district court cogently summarized, the plaintiffs' evidence merely demonstrates that Sears demanded compliance with the licensing agreement with specification and rigor; there is no evidence, however, that Sears exercised the type of discretionary control over individual Diamond employees with the same specification and rigor necessary to establish an employer-employee relationship. For these reasons, Sears is entitled to summary judgment. Accordingly, the judgment of the district court is AFFIRMED.