(No. 78662.—

RICHARD BUSCH, Adm'r of the Estate of Melissa Busch, Deceased, Appellant, v. GRAPHIC COLOR CORPORATION *et al.*, Appellees.

*Opinion filed February 15, 1996.*

HARRISON, J., took no part.
MILLER, J., specially concurring.

Carl F. Schroeder, of Schroeder & Hruby, Ltd.; of Wheaton, for appellant.

Stephen A. Rehfeldt and Louis A. Varchetto, of Wylie, Mulherin, Rehfeldt & Varchetto, P.C., of Wheaton, for appellee Graphic Color Corp.

Robert J. Rubin and Jane B. McCullough, of Altheimer & Gray, of Chicago, for appellee Amrep, Inc.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

The plaintiff, Richard Busch, as administrator of the estate of his deceased wife, Melissa, filed this wrongful death action in the circuit court of Du Page County against AMREP, Inc. (AMREP), and Graphic Color Corporation (Graphic Color) for the benefit of himself, the surviving spouse. Melissa died of methylene chloride intoxication after using a paint stripper manufactured by AMREP while on the premises of R. Busch Drum, Inc. (Busch Drum), a corporation of which Richard Busch is president and part owner. Prior to Melissa's death, several cases of the paint stripper had been supplied to Busch Drum by a representative of Graphic Color. No claim or action for Melissa's death was brought by the plaintiff against Busch Drum.

The trial court entered summary judgment in favor of the defendants on the ground that the common law tort claims on which the plaintiff's wrongful death action is based are preempted by provisions of the Federal Hazardous Substances Act (FHSA) (15 U.S.C. § 1261 et seq. (1988)). The appellate court affirmed. (268 Ill. App. 3d 763.) We allowed the plaintiff's petition for leave to appeal (145 Ill. 2d R. 315).

## FACTS

Busch Drum is a small corporation engaged in the business of buying, selling, and brokering industrial drums. Richard Busch is the president of Busch Drum, and he and his mother, Carol Busch, are the sole owners and the only employees of the company. Although Richard and Melissa were married, Melissa was not connected with Busch Drum in any capacity.

Graphic Color is a printing company which uses

large ink vats in its printing operations. In the summer of 1988, nearly a year before Melissa's death, Busch Drum entered into an agreement with Graphic Color to periodically clean its ink vats. This task, however, was not part of Busch Drum's regular business operations. Richard, who was Busch Drum's only production employee, undertook the task of cleaning the vats in the company's garage. Graphic Color delivered the vats to Busch Drum along with rags, dust masks, and cleaning solvent, and a Graphic Color representative instructed Richard on how to clean the vats.

The solvent was a product called "Misty Paint Stripper and Decal Remover" (Misty Paint Stripper) manufactured by AMREP. The paint stripper contained a variable amount of methylene chloride, which AMREP purchased from Dow Chemical Corporation, with a maximum concentration of 77%. Richard was given five cases of Misty Paint Stripper for each vat to be cleaned. Each case contained 12 cans of the product, and Richard was told by the Graphic Color representative that it would take 60 cans to clean each vat.

Melissa was not an employee, agent, or independent contractor of Busch Drum but helped out in the office from time to time without pay. On occasion, Melissa saw Richard cleaning the ink vats. However, she was never asked or required to clean the vats.

On March 20, 1989, the day of Melissa's death, Richard went to the office early in the morning before leaving to meet with customers. Melissa was at home at this time. When Richard returned to the office at approximately 12:20 p.m., he found Melissa unconscious in the garage near one of the vats. Several empty cans of Misty Paint Stripper and numerous rags were lying about; Melissa was wearing a dust mask and was covered with ink. According to Richard, the windows

were open and the fans were on when he found Melissa. The medical examiner's report, however, indicated that Richard had told an investigator that the garage had "no mechanical ventilation" and that "all windows and doors were closed" when he returned to find Melissa. Richard and his mother both submitted affidavits stating that Melissa had not been requested or authorized to clean the ink vats. Richard further stated that he was "totally unaware of her presence" on the premises until he returned to find her. The cause of Melissa's death was determined to be methylene chloride intoxication.

In his affidavit, Richard stated that, had he known the Misty Paint Stripper could be fatal if inhaled, he "would not have accepted the assignment" to clean the vats. He also indicated that he was told by representatives of Graphic Color that he could use as much of the product as was necessary to clean the vats and that the only safety equipment needed was a dust mask.

Robert Davis, a chemist whom the plaintiff retained as an expert witness, explained in an affidavit that methylene chloride "is poisonous when inhaled in that it causes the inhibition of the release of carbon dioxide from hemoglobin in the blood which prevents the hemoglobin from picking up oxygen." He stated that inhalation of a sufficient amount of the chemical can cause unconsciousness and even death. According to Davis, the risk of cancer which has also been tied to methylene chloride is a risk "separate and apart from its risk as a poisonous substance when inhaled." Accordingly, a warning separate from that concerning the chemical's potential carcinogenic effects needed to be included in the Misty Paint Stripper's label. Davis reviewed the warning appearing on the Misty Paint Stripper label, which reads as follows:

(Front Panel)
**"WARNING**
VAPOR HARMFUL. CONTENTS
UNDER PRESSURE. KEEP OUT
OF REACH OF CHILDREN. Read
other precautions on back panel."
(Back Panel)
**"WARNING**
Contains methylene chloride which
has been shown to cause cancer in
certain laboratory animals. Risk to
your health depends on level
and duration of exposure.
Use this product outdoors if
possible. If you must use it
indoors, open all windows and doors
or use other means to ensure fresh
air movement during application and
drying. If properly used, a
respirator may offer additional
protection. Obtain professional
advice before using. A dust mask
does not provide protection against
vapors. Do not use in basement or
other unventilated areas.
Avoid contact with skin and eyes.
First Aid Treatment: Contains
Methylene Chloride and less than 4%
Methyl Alcohol. In case of eye
contact, flush with water
thoroughly. Call a physician
immediately. If swallowed, induce
vomiting by placing fingers or spoon
at back of throat. Call physician
immediately. Keep patient warm.
Avoid inhalation of spray mist. If
overcome, move patient to fresh air.
Call physician immediately."

Based on a reasonable degree of scientific certainty, Davis concluded that the label was insufficient in that it failed to specifically warn the user that the product can

cause death by asphyxiation if a sufficient amount of methylene chloride is inhaled. He further concluded that in order for the product to be reasonably safe for its intended use, it would have to be accompanied by warnings substantially similar to those contained in the manufacturer's safety data sheet which Dow Chemical provided to AMREP. Among other things, the data sheet indicates that methylene chloride vapor is "heavier than air and will collect in low areas such as *** storage tanks and other confined areas." The data sheet also indicates that accumulated vapors "can readily cause unconsciousness or death." Davis explained that additional warnings such as these are essential because methylene chloride has a narcotic effect which gives the user a false sense of well-being prior to the time he loses consciousness. According to Davis, a general warning about ventilation is "insufficient."

In his amended complaint, the plaintiff based his wrongful death claim against AMREP on the doctrine of strict product liability. Specifically, the plaintiff asserted that the Misty Paint Stripper was defective and unreasonably dangerous because the product's label failed to warn that the inhalation of the paint stripper vapors would cause death. He also asserted that the label contained inadequate instructions regarding how to safely use the product. According to the plaintiff, the defective and unreasonably dangerous condition of the product proximately caused Melissa's death.

The plaintiff's wrongful death claim against Graphic Color sounded in negligence. Specifically, the plaintiff asserted that Graphic Color was negligent in failing to warn Busch Drum that the inhalation of Misty Paint Stripper could prove fatal and in failing to properly instruct Busch Drum as to the proper use of the product. According to the plaintiff, Graphic Color's negligent conduct proximately caused Melissa's death.

AMREP and Graphic Color filed separate motions for summary judgment contending that the plaintiff's allegations of strict product liability and negligence were preempted by the FHSA. In addition, Graphic Color argued that it owed no legal duty to Melissa to warn of the dangers of using the Misty Paint Stripper because Melissa was not one who Graphic Color could have reasonably anticipated would use the product. In granting the defendants' motions, the trial court agreed that the FHSA preempted the plaintiff's State-law tort claims. The appellate court affirmed. 268 Ill. App. 3d 763.

## ANALYSIS

Summary judgment is appropriate where the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, reveal that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c); *Espinoza v. Elgin, Joliet & Eastern Ry. Co.* (1995), 165 Ill. 2d 107, 113; *Gilbert v. Sycamore Municipal Hospital* (1993), 156 Ill. 2d 511, 517-18.) The purpose of summary judgment is to determine whether a question of fact exists. (*Gilbert*, 156 Ill. 2d at 517.) Although summary judgment is encouraged to aid in the expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation and should thus be allowed only when the movant's right is clear and free from doubt. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) As in all cases involving summary judgment, our review of the evidence is *de novo. Espinoza*, 165 Ill. 2d at 113.

The plaintiff contends that the appellate court erred in upholding the trial court's grant of summary judgment for the defendants on the basis that his tort claims were preempted by provisions of the FHSA. For the reasons which follow, we affirm the grant of summary

judgment in favor of AMREP and Graphic Color. As to AMREP, we premise our holding on the doctrine of Federal preemption. As to Graphic Color, however, our holding is based on the principles set forth in section 388 of the Restatement of Torts (Restatement (Second) of Torts § 388 (1965)).

## A. AMREP

The supremacy clause contained in article VI of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land, *** any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) Thus, where State law conflicts with Federal law, the former is "without effect." (*Maryland v. Louisiana* (1981), 451 U.S. 725, 746, 68 L. Ed. 2d 576, 595, 101 S. Ct. 2114, 2128.) The United States Supreme Court recently revisited the issue of Federal preemption in *Cipollone v. Liggett Group, Inc.* (1992), 505 U.S. 504, 120 L. Ed. 2d 407, 112 S. Ct. 2608. In *Cipollone*, the Court reiterated that "[c]onsideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.' " (*Cipollone*, 505 U.S. at 516, 120 L. Ed. 2d at 422, 112 S. Ct. at 2617, quoting *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 230, 91 L. Ed. 1447, 1459, 67 S. Ct. 1146, 1152.) Accordingly, the Court noted, " ' "[t]he purpose of Congress is the ultimate touchstone" ' of pre-emption analysis. [Citations.]" *Cipollone*, 505 U.S. at 516, 120 L. Ed. 2d at 422, 112 S. Ct. at 2617; accord *Spitz v. Goldome Realty Credit Corp.* (1992), 151 Ill. 2d 71, 74; *Castillo v. Jackson* (1992), 149 Ill. 2d 165, 173-74 ("It is the power and *intent* of Congress to preempt an area of law which triggers the requirements of the supremacy clause" (emphasis in original)).

Congress' intent to preempt State law may be manifested "by express provision, by implication, or by a conflict between federal and state law." (*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance* (1995), 514 U.S. 645, 654, 131 L. Ed. 2d 695, 704, 115 S. Ct. 1671, 1676.) However, "[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' [citation], 'there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the legislation. [Citation.]" *Cipollone*, 505 U.S. at 517, 120 L. Ed. 2d at 423, 112 S. Ct. at 2618.

In addressing the preemptive scope of the FHSA, we note preliminarily that the decisions of the Federal courts interpreting a Federal act such as the FHSA are controlling upon Illinois courts, "in order that the act be given uniform application." (*Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, 200; *Boyer v. Atchison, Topeka & Santa Fe Ry. Co.* (1967), 38 Ill. 2d 31, 34; *Elgin, Joliet & Eastern Ry. Co. v. Industrial Comm'n* (1956), 9 Ill. 2d 505, 507; see also *Hiles v. Norfolk & Western Ry. Co.* (1994), 268 Ill. App. 3d 561, 563; *Golden Bear Family Restaurants, Inc. v. Murray* (1986), 144 Ill. App. 3d 616, 620.) Having so noted, we proceed now to determine how the Federal courts have construed the FHSA's preemptive scope.

In the recent case of *Moss v. Parks* (4th Cir. 1993), 985 F.2d 736, the Fourth Circuit Court of Appeals set forth the relevant legislative history of the FHSA and its preemption provision. The court explained:

"The FHSA was enacted in 1960. The purpose of the law was to 'provide nationally uniform requirements for adequate cautionary labeling of packages of hazardous substances which are sold in interstate commerce and are

intended or suitable for household use.' House Comm. On Interstate and Foreign Commerce, Federal Hazardous Substances Labeling Act, H.R.Rep. No. 1861, 86th Cong., 2d Sess. 2 (1960), *reprinted in* 1960 U.S.C.C.A.N. 2833, 2833. As enacted the FHSA did not contain a preemption section. However, *when the Act was amended in 1966, the legislative history discussed the impracticality of having the states produce potentially fifty different labels for a particular hazardous substance. Congress recommended 'a limited preemption amendment which would encourage and permit states to adopt requirements identical with the federal requirements for substances subject to the Federal Act, and to enforce them to complement Federal enforcement ...'* House Comm. On Interstate and Foreign Commerce, Child Protection Act of 1966, H.R.Rep. No. 2166, 89th Cong., 2d Sess. 3 (1966), *reprinted in* 1966 U.S.C.-C.A.N., 4095, 4096." (Emphasis added.) *Moss*, 985 F.2d at 739.

The 1966 amendments to the FHSA added the following preemption provision, at issue in the present case:

"[I]f a hazardous substance or its packaging is subject to a cautionary labeling requirement under section 2(p) or 3(b) [subsec. (p) of this section or section 1262(b) of this title] designed to protect against a risk of illness or injury associated with the substance, no State or political subdivision of a State may establish or continue in effect a cautionary labeling requirement applicable to such substance or packaging and designed to protect against the same risk of illness or injury unless such cautionary labeling requirement is identical to the labeling requirement under section 2(p) or 3(b) [subsec. (p) of this section or section 1262(b) of this title]." 15 U.S.C. § 1261 note (b)(1)(A) (1988).

In discussing Congress' purpose for enacting the FHSA's preemption provision, the Ninth Circuit Court of Appeals, in *Chemical Specialties Manufacturers Association, Inc. v. Allenby* (9th Cir. 1992), 958 F.2d 941, noted:

"On the one hand, a national safety standard would ease

the burden of compliance for chemical product manufacturers by relieving them from the burden of complying with fifty-one separate regulatory schemes promulgated by each state and the federal government. On the other hand, such a standard would take police powers away from the states who best know how to serve the interests of their citizenry. *The preemption clause in [the] FHSA balances these competing concerns by leaving cautionary labeling requirements to the federal government while allowing states to regulate the sale and use of hazardous chemicals.*" (Emphasis added.) *Allenby*, 958 F.2d at 950.

It is clear from the foregoing that Congress intended to preempt all nonidentical State laws proposing cautionary labeling requirements addressing the same risk of illness or injury as the FHSA. The question remains, however, whether the "state laws" which the FHSA's preemption provision is intended to preempt include common law tort claims based on a failure to warn which seek to impose labeling requirements different from those imposed under the Federal act. The plaintiff argues that such claims are not included in the category of laws subject to preemption. We find, however, that under the United States Supreme Court's holding in *Cipollone* and the Federal decisions which have followed since *Cipollone*, such claims are subject to preemption.

In *Cipollone*, a plurality of the Supreme Court concluded that Federal law can, under some circumstances, preempt common law tort actions. At issue in *Cipollone* was whether the Federal Cigarette Labeling and Advertising Act and its successor, the Public Health Cigarette Smoking Act of 1969, served to preempt the petitioner's common law tort claims. Both statutes contained express preemption provisions. Although the Court found that the predecessor statute had no preemptive effect on State-law tort actions, it concluded that the preemption provision of the 1969 statute did. That provision reads as follows:

"(b) No *requirement or prohibition* based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the *packages of which are labeled in conformity with the provisions of this Act.*" (Emphasis added.) See *Cipollone*, 505 U.S. at 515, 120 L. Ed. 2d at 422, 112 S. Ct. at 2617.

In holding that the above provision was broad enough to preclude common law tort actions, the plurality rejected the petitioner's contention that such actions imposed neither "requirement[s]" nor "prohibition[s]." The plurality dismissed the petitioner's assertion that Congress intended only to preempt State statutes, injunctions, and executive pronouncements and not tort actions pursued in a judicial forum. (*Cipollone*, 505 U.S. at 521, 120 L. Ed. 2d at 426, 112 S. Ct. at 2620.) On this point, the Court declared:

"The phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules. As we noted in another context, '[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.' [Citation.]

\*\*\*

Moreover, common-law damages actions of the sort raised by petitioner are premised on the existence of a legal duty, and it is difficult to say that such actions do not impose 'requirements or prohibitions.' \*\*\* [I]t is the essence of the common-law to enforce duties that are either affirmative *requirements* or negative *prohibitions*. We therefore reject petitioner's argument that the phrase 'requirement or prohibition' limits the 1969 Act's preemptive scope to positive enactments by legislatures and agencies." (Emphasis in original.) *Cipollone*, 505 U.S. at 521-22, 120 L. Ed. 2d at 426, 112 S. Ct. at 2620.

The Court went on to state the standard to be applied in determining which, if any, of the petitioner's

common law claims were preempted by the 1969 act. The Court explained that "[t]he central inquiry in each case is *** whether the legal duty that is the predicate of the common-law damages action constitutes a 're-quirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertis-ing or promotion,' giving that clause a fair but narrow reading." (*Cipollone*, 505 U.S. at 523-24, 120 L. Ed. 2d at 427, 112 S. Ct. at 2621.) Applying that test to each of the common law claims raised by the petitioner, the Court held that the petitioner's failure-to-warn theory was preempted because it sought to impose additional or more clearly stated warnings relating to cigarettes than those imposed by the 1969 act. *Cipollone*, 505 U.S. at 524, 120 L. Ed. 2d at 428, 112 S. Ct. at 2621-22.[1]

Since *Cipollone*, the majority of Federal courts that have addressed the issue of Federal preemption over State common law claims based on, among other things, a failure to warn, where the preemption provision at is-sue is similar or identical to the one in *Cipollone*, have found the State-law claims to be preempted. See, *e.g.*, *Taylor AG Industries v. Pure-Gro* (9th Cir. 1995), 54 F.3d 555; *Bice v. Leslie's Poolmart, Inc.* (8th Cir. 1994), 39 F.3d 887; *National Bank of Commerce v. Kimberly-Clark Corp.* (8th Cir. 1994), 38 F.3d 988; *MacDonald v. Mon-santo Co.* (5th Cir. 1994), 27 F.3d 1021; *Gile v. Optical Radiation Corp.* (3rd Cir. 1994), 22 F.3d 540; *Mendes v.*

---

[1]In their opinion concurring in the judgment in part and dis-senting in part, Justices Scalia and Thomas agreed with the four-member plurality that the 1969 statute applied to State common law actions and served to preempt the petitioner's failure-to-warn claims. The justices went on to conclude, however, that Congress clearly intended the statute to preempt the petitioner's remain-ing tort claims as well, as evidenced by the statute's "text, structure, purposes and subject matter." *Cipollone*, 505 U.S. at 544-45, 120 L. Ed. 2d at 441, 112 S. Ct. at 2632 (Scalia, J., concur-ring in part & dissenting in part, joined by Thomas, J.).

*Medtronic, Inc.* (1st Cir. 1994), 18 F.3d 13; *Worm v. American Cyanamid Co.* (4th Cir. 1993), 5 F.3d 744; *King v. E.I. DuPont de Nemours & Co.* (1st Cir. 1993), 996 F.2d 1346; *Shaw v. Dow Brands, Inc.* (7th Cir. 1993), 994 F.2d 364; *Moss*, 985 F.2d 736; *Papas v. Upjohn Co.* (11th Cir. 1993), 985 F.2d 516; *Stamps v. Collagen Corp.* (5th Cir. 1993), 984 F.2d 1416; *Arkansas-Platte & Gulf Partnership v. Van Waters & Rogers, Inc.* (10th Cir. 1993), 981 F.2d 1177.

More pertinent to this case, a number of these Federal decisions have addressed the effect of the preemption provision under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. § 136 *et seq.* (1988)) and have found no notable difference between the preemption language in the 1969 act at issue in *Cipollone* and that found in the FIFRA. (See, *e.g., Taylor*, 54 F.3d 555; *Bice*, 39 F.3d 887; *MacDonald*, 27 F.3d 1021; *Worm*, 5 F.3d 744; *King*, 996 F.2d 1346; *Shaw*, 994 F.2d 364; *Papas*, 985 F.2d 516; *Arkansas-Platte*, 981 F.2d 1177.) The preemption language of the FIFRA provides that States "shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." (7 U.S.C. § 136v(b) (1988).) The FIFRA provision is substantively equivalent, in our view, to the FHSA's preemption provision. Indeed, Federal courts which have addressed the issue are in accord with this finding. See, *e.g., Moss*, 985 F.2d at 740 n.3 ("The preemption language of the two statutes is nearly identical"); *Chemical Specialties*, 958 F.2d at 945 ("The preemption issues arising under FHSA are identical to those arising under FIFRA"); see also *DeHaan v. Whink Prods. Co.* (N.D. Ill. January 25, 1994), No. 91—C—0014 (the preemption provisions under FHSA and FIFRA are "effectively identical").

Thus, applying *Cipollone* and its progeny to the pres-

ent case, we conclude that the FHSA's preemption provision precludes plaintiffs from bringing common law tort claims which seek to impose cautionary labeling requirements for hazardous substances which are different from and are designed to protect against the same risk of illness or injury as those imposed by the FHSA. We must now consider whether the plaintiff's claims against AMREP seek to impose labeling requirements that are different from those imposed under the FHSA. Under section 1261(p) of the FHSA, the labeling of a hazardous substance must:

"(1) *** state[ ] conspicuously (A) the name and place of business of the manufacturer, packer, distributor or seller; (B) the common or usual name or the chemical name (if there be no common or usual name) of the hazardous substance or of each component which contributes substantially to its hazard, unless the Commission by regulation permits or requires the use of a recognized generic name; (C) the signal word 'DANGER' on substances which are extremely flammable, corrosive, or highly toxic; (D) the signal word 'WARNING' or 'CAUTION' on all other hazardous substances; (E) an affirmative statement of the principal hazard or hazards, such as 'Flammable', 'Combustible', 'Vapor Harmful', 'Causes Burns', 'Absorbed Through Skin', or similar wording descriptive of the hazard; (F) precautionary measures describing the action to be followed or avoided, except when modified by regulation of the Commission pursuant to section 1262 of this title; (G) instruction, when necessary or appropriate, for first-aid treatment; (H) the word 'poison' for any hazardous substance which is defined as 'highly toxic' by subsection (h) of this section; (I) instructions for handling and storage of packages which require special care in handling or storage; and (J) the statement (i) 'Keep out of the reach of children' or its practical equivalent, or, (ii) if the article is intended for use by children and is not a banned hazardous substance, adequate directions for the protection of children from the hazard ***." 15 U.S.C. § 1261(p)(1) (1988).

The plaintiff maintains that the labeling provisions

of section 1261(p) impose no "requirements" with respect to the cautionary labeling of paint strippers, such as the Misty Paint Stripper at issue here, because they set forth no specific precautions for any specific type of product. The plaintiff argues that the labeling provisions of section 1261(p) are more in the nature of non-compulsory guidelines to which companies can refer in crafting the cautionary labels for the hazardous substances they manufacture. We reject this contention. Despite the fact that the provisions are couched in general terms encompassing every type of hazardous substance, they are nonetheless requirements for the cautionary labeling of hazardous substances, which the plaintiff concedes includes Misty Paint Stripper. Indeed, Congress made this fact clear by referring to the provisions of section 1261(p) as cautionary labeling "requirements" in the language of the FHSA's preemption provision. See 15 U.S.C. § 1261 note (b)(1)(A) (1988).

Moreover, the Consumer Product Safety Commission (Safety Commission)—the Federal agency responsible for administering the FHSA—offered a detailed labeling example for paint strippers containing methylene chloride which it concluded conformed to the labeling requirements of section 1261(p) of the FHSA. Apart from evidencing that the provisions of section 1261(p) are to be treated as labeling "requirements," the Safety Commission's labeling example illustrates how those requirements are met for products like Misty Paint Stripper.

The promulgation of the labeling example was prompted by a 1985 petition filed by the Consumer Federation of America seeking to have household products containing methylene chloride declared "hazardous substances" and to have them banned pursuant to section 1261(q). (See Petition HP 85—1, Petition Requesting Ban of Household Products Containing

Methylene Chloride, 53 Fed. Reg. 14,590 (1988).) Subsequently, the Safety Commission, in August of 1986, proposed a rule to declare paint strippers and other household products containing other than nominal levels of methylene chloride to be hazardous substances. Household Products Containing Methylene Chloride; Status as Hazardous Substances, 51 Fed. Reg. 29,778 (1986).

In August 1987, the Safety Commission determined that there was insufficient controversy to warrant a rulemaking proceeding on the issue and published a notice of interpretation and enforcement policy (hereinafter 1987 Notice) stating its view that household products containing methylene chloride are hazardous substances and are thus subject to the FHSA's labeling requirements. (Labeling of Certain Household Products Containing Methylene Chloride; Statement of Interpretation and Enforcement Policy, 52 Fed. Reg. 34,698 (1987).) Discussing the labeling requirements under the FHSA for products containing methylene chloride, the Safety Commission set forth a "Detailed Example of Labeling for Paint Strippers" and noted that the label was the work product of industry and consumer interest representatives working with the Safety Commission's staff. (52 Fed. Reg. 34,698, 34,702 (1987).) The detailed example offered by the Safety Commission provides as follows:

(Front Panel)
"CAUTION: Vapor Harmful, Read Other
Cautions and HEALTH HAZARD
INFORMATION on Back Panel
[or equivalent language]"

(Back Panel)
Contains methylene chloride, which has
been shown to cause cancer in certain
laboratory animals. Risk to your health

depends on level and duration of exposure. [Or equivalent language] [The back panel labeling given above would be placed separately from use precaution information such as the following.] Use this product outdoors, if possible. If you must use it indoors, open all windows and doors or use other means to ensure fresh air movement during application and drying. If properly used, a respirator may offer additional protection. Obtain professional advice before using. A dust mask does not provide protection against vapors. Do not use in basement or other unventilated area. Open container carefully and close after each use. Clean up rags, papers, and waste promptly. Allow solvent to evaporate, then dispose of in metal containers."

The Safety Commission declared in its 1987 Notice that the above labeling language fulfills the requirements of section 1261(p) of the FHSA. (52 Fed. Reg. 34,698, 34,702 (1987).) The Safety Commission's labeling example represents an interpretation of a statute by the administrative agency charged with administering the FHSA. This court has held that an administrative agency's interpretation of a statute it is responsible for administering "should be accorded considerable deference" so long as Congress has not expressed its intent as to the issue and provided the agency's interpretation is reasonable. See *Spitz*, 151 Ill. 2d at 76; see also *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984), 467 U.S. 837, 844, 81 L. Ed. 2d 694, 704, 104 S. Ct. 2778, 2782.

As stated, the Safety Commission has concluded that its detailed labeling example satisfies the cautionary labeling requirements of section 1261(p)(1) of the FHSA. (52 Fed. Reg. 34,698, 34,702 (1987).) In the view of the Safety Commission, therefore, nothing more is required

of labels for paint strippers containing methylene chloride under the FHSA, other than what is stated in its example. We hold that it is appropriate to defer to the Safety Commission on this point since Congress has yet to express its view on the issue and because we find the Safety Commission's interpretation to be reasonable.

As the facts indicate, the label contained on the Misty Paint Stripper product used by Melissa was virtually identical to the detailed example set forth by the Safety Commission. The labeling requirements which the plaintiff seeks to impose on AMREP, namely, a warning that inhalation of Misty Paint Stripper "would cause death" and "adequate instructions for its use" (implying that the existing instructions are *not* adequate), constitute requirements that are not "identical" to those required under section 1261(p)(1). (See 15 U.S.C. § 1261 note (b)(1)(A) (1988).) As the Safety Commission's interpretation of section 1261(p)(1) reveals, the additional information which the plaintiff seeks to require AMREP to place on the label is not mandated by the FHSA. Accordingly, the plaintiff's tort claims against AMREP, based on a failure to warn, are preempted.

As a final argument, however, the plaintiff contends that his claims are not, in fact, preempted because the information he alleges should have been included on the Misty Paint Stripper label covers a risk of injury different from the risk of injury against which the labeling requirements of the Federal act were designed to protect. The plaintiff asserts that the Safety Commission's own comments in its 1987 Notice reveal that the risk of injury which the FHSA's cautionary labeling requirements for paint strippers were intended to protect against was the risk of cancer, not the risk of asphyxiation, which Melissa encountered.

We agree with the plaintiff that under the subject

preemption provision, only those labeling requirements which are "designed to protect against the *same* risk of illness or injury" as those targeted by the Federal statute are preempted. (Emphasis added.) (15 U.S.C. § 1261 note (b)(1)(A) (1988).) We also agree that the Safety Commission's *primary* focus in issuing its 1987 Notice was, in fact, to warn consumers of the carcinogenic risks posed by methylene chloride found in products such as paint strippers. We disagree, however, that the risk of cancer was the Safety Commission's sole focus. The Safety Commission has expressly acknowledged its concern with the risk to individuals of acute inhalation intoxication posed by methylene chloride vapors. This concern is evidenced by statements made by the Safety Commission in 1992 when it responded to several individuals' comments regarding the preemptive scope of the FHSA. In responding to one individual's comment that the labeling requirements of the FHSA were too weak and vague to preempt State laws, the Commission responded:

"The requirements of the FHSA are not vague. *** [T]he labeling must communicate to the consumer an understanding of the potential principal hazard *or hazards* presented by the product in order to avoid being misbranded and subject to legal action.

\* \* \*

The cautionary label required under [section 1261(p) of] the FHSA must present a balanced perspective of the potential hazards of the product. Many products which may cause chronic health effects may also be acutely toxic and present physical hazards, such as flammability." (Emphasis added.) 57 Fed. Reg. 46,626, 46,664 (1992).

The Commission then went on to highlight the labeling requirements under the FHSA for paint strippers containing methylene chloride:

"The suggested labeling for methylene chloride paint strippers had to take into consideration the product's *acute inhalation toxicity in addition to the carcinogenicity*

*hazard.* Therefore, the suggested front panel label statement is 'VAPOR HARMFUL' with the instruction 'Read Other Cautions and HEALTH HAZARD INFORMATION on back panel' and the back panel statement is 'Contains methylene chloride, which has been shown to cause cancer in certain laboratory animals.' For products where the *only* hazard is carcinogenicity and the evidence of increased risk of cancer to humans is clear, *the labeling would be more straightforward.*" (Emphasis added.) 57 Fed. Reg. 46,626, 46,664 (1992).

As the foregoing comments of the Safety Commission indicate, the cautionary labeling requirements of the FHSA for paint strippers containing methylene chloride are intended to protect against the same risk at issue here, namely, the risk of acute inhalation toxicity. Accordingly, we find the plaintiff's final argument to be without merit.

For the reasons stated, we hold that the plaintiff's failure-to-warn claims against AMREP, upon which he bases his wrongful death action, are preempted by the FHSA. Our holding today comports with Congress' stated goal in enacting the Federal statute and the preemption provision contained therein of providing nationally uniform requirements for the cautionary labeling of hazardous substances like the paint stripper at issue here. Accordingly, we affirm the judgment of the appellate court, which affirmed the circuit court's grant of summary judgment in favor of AMREP.

## B. Graphic Color

We also affirm that portion of the judgment of the appellate court that affirmed the circuit court's grant of summary judgment in favor of Graphic Color, although for reasons different from those relied upon by the courts below. It is within this court's power and discretion to affirm the decision below on any ground warranted, regardless of whether that ground was relied on by the lower courts or whether the reasons given by

those courts were correct. *Federal Deposit Insurance Corp. v. O'Malley* (1994), 163 Ill. 2d 130, 140; *Messenger v. Edgar* (1993), 157 Ill. 2d 162, 177.

We decline to resolve the issue of Graphic Color's liability on the basis of Federal preemption because the plaintiff's claims against this defendant appear to stem not from the label affixed to the Misty Paint Stripper but from a general failure to warn of the product's dangers and the failure to properly instruct as to its proper use. Thus, unlike the claims against AMREP, the allegations against Graphic Color do not on their face seek to impose cautionary labeling requirements with respect to the Misty Paint Stripper different from those imposed by the FHSA.

The precise allegations against Graphic Color, contained in count I of the plaintiff's amended complaint, are that it:

> "a. Failed to warn R. Busch Drum, Inc. that the inhalation of 'Misty Paint Stripper and Decal Remover' would cause the death of individuals using said product;
>
> b. Failed to properly instruct R. Busch Drum, Inc. in the use of the 'Misty Paint Stripper and Decal Remover.' "

In addition to arguing that these claims are preempted by the FHSA, Graphic Color argues that it owed no legal duty to warn *Melissa* of the dangers arising from use of the paint stripper or to instruct her as to its proper use because she was not a foreseeable user of the product. In support of this contention, Graphic Color cites to section 388 of the Restatement of Torts, which addresses the liability of persons supplying chattels for the use of others. In *Huckabee v. Bell & Howell, Inc.* (1970), 47 Ill. 2d 153, this court, although not explicitly adopting section 388's provisions, cited to those provisions with approval. We find that this case is an appropriate one for application of section 388. For the reasons which follow, we hold that section 388 of the Restatement bars the plaintiff's action against Graphic Color.

Section 388 states:

"§ 388. Chattel Known to be Dangerous for Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability *to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use,* for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." (Emphasis added.) Restatement (Second) of Torts § 388 (1965).

The chattel at issue here is the Misty Paint Stripper which Graphic Color supplied to Busch Drum for use in cleaning its ink vats. Prior to Melissa's death, Richard was the only Busch Drum employee who had ever cleaned Graphic Color's vats. Melissa was never authorized by Richard or Carol Busch to perform that task. In an affidavit, Richard admitted that Melissa "was never an employee, agent or independent contractor of or for R. Busch Drum, Inc. *** [and] was never paid any sums of money, whether by cash or negotiable instrument at any time whatsoever." He further admitted that he "at no time ever requested that *** Melissa go to the premises of R. Busch Drum, Inc. for any reason on March 20, 1989 and *** was totally unaware of her presence at the premises of R. Busch Drum, Inc. until such time as [he] arrived [there] *** at approximately 12:20 p.m. ***." Furthermore, in his answers to AMREP's interrogatories, Richard stated that he provided no warn-

ings, instructions or training to Melissa regarding how to clean the ink vats or properly use the Misty Paint Stripper.

Similarly, Carol Busch acknowledged in an affidavit that she and Richard were the only employees of Busch Drum, that Melissa was never employed or retained in any capacity by the company, and that she never requested or authorized Melissa to clean Graphic Color's vats.

The record shows that Graphic Color supplied Busch Drum, not Melissa, with the Misty Paint Stripper, and the Graphic Color representative instructed only Richard on how to clean the ink vats using the paint stripper.

Applying the provisions of section 388 to the foregoing facts, we hold that Graphic Color cannot be subject to liability for Melissa's death. Under section 388, Graphic Color is only liable for injuries to those whom it "should expect" to use the paint stripper supplied to Busch Drum "with the consent of" Busch Drum or to those whom Graphic Color "should expect *** to be endangered by its probable use" when used "in the manner for which and by a person for whose use it is supplied." (Restatement (Second) of Torts § 388 (1965).) Clearly, Melissa falls into neither of these categories.

Comment *a* to section 388 explains that:

> "The words 'those whom the supplier should expect to use the chattel' and the words 'a person for whose use it is supplied' include not only the person to whom the chattel is turned over by the supplier, but also all those who are members of a class whom the supplier should expect to use it or occupy it or share in its use with the consent of such person ***. ***
>
> In the cases thus far decided, the rule stated in this Section has been applied only in favor of those who are injured while the chattel is being used *by the person to whom it is supplied, or with his consent.*" (Emphasis add-

ed.) Restatement (Second) of Torts § 388, Comment *a*, at 301 (1965).

Further discussing the scope of liability under section 388, comment *e* explains that, "[e]xcept possibly where there is a privilege to use the chattel, the one who supplies a chattel for another's use is not subject to liability for bodily harm caused by its use *by a third person without the consent of him for whose use it is supplied.*" (Emphasis added.) Restatement (Second) of Torts § 388, Comment *e*, at 303 (1965).

As Graphic Color points out, under the applicable provisions of section 388, the plaintiff must prove two things before Graphic Color can be subject to liability for Melissa's death. First, he must show that Melissa used the paint stripper supplied by Graphic Color with the consent of someone at Busch Drum. Second, he must show that Graphic Color should have expected that Melissa would use the product. By virtue of the numerous admissions in the record indicating that Melissa was never authorized by anyone at Busch Drum to clean the ink vats or to use the paint stripper, Graphic Color cannot be subject to liability for her death. Apart from being Richard's wife, Melissa had no connection whatsoever with Busch Drum. At the time of her death, unbeknownst to Richard or Carol Busch, Melissa took it upon herself to enter Busch Drum's premises and undertake the task of cleaning Graphic Color's ink vats using the Misty Paint Stripper. Melissa had never cleaned the vats in the past, nor was she ever taught how to properly do so. Under these circumstances, Melissa clearly was not a member of a class who Graphic Color should have expected would use the paint stripper. Accordingly, Graphic Color is not liable for her death. See Restatement (Second) of Torts § 388, Comment *a*, at 301 (1965).

Finally, we reject the plaintiff's assertion that Graphic Color is subject to liability for Melissa's death

because she was "privileged" to use the paint stripper despite the lack of consent from Richard or Carol Busch. (See Restatement (Second) of Torts § 388, Comment *e*, at 303 (1965).) The plaintiff bases this "privilege" on the fact that Melissa was his wife and it is commonly understood that in a small, family-owned company, such as Busch Drum, family members will often help out around the company. Under such circumstances, the plaintiff argues, Melissa falls within the class of persons who Graphic Color should have expected would use the paint stripper. The plaintiff has cited no authority to support this contention. In any event, this court cannot permit the unfairness that would result from such a holding particularly where Richard and Carol Busch both repeatedly admitted that Melissa was not authorized to clean the ink vats or to use the paint stripper which Graphic Color supplied to Busch Drum. For these reasons, summary judgment was properly entered in favor of Graphic Color.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court, upholding the circuit court's grant of summary judgment in favor of AMREP and Graphic Color, is affirmed.

*Judgment affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.

JUSTICE MILLER, specially concurring:

I concur in the judgment of the court. I write separately because I believe that Federal legislation preempts the plaintiff's action in its entirety.

The majority holds that the provisions of the Federal Hazardous Substances Act (FHSA) (15 U.S.C. § 1261 *et seq.* (1988)) preempt the plaintiff's claim against defen-

dant AMREP, Inc., manufacturer of Misty Paint Stripper and Decal Remover. The majority declines, however, to adopt that reasoning with respect to defendant Graphic Color, which supplied the product to the plaintiff. The majority instead concludes that Graphic Color owed no duty of care to the decedent because she was not a foreseeable user of the product. I believe that the plaintiff's claim against Graphic Color is similarly preempted by the FHSA and, like the trial judge and appellate court, would grant summary judgment to Graphic Color on that ground. Allowing the plaintiff to proceed with his common law action against Graphic Color would be inconsistent with the preemptive features of the Federal legislation.

The preemption provision of the FHSA states:

> "[I]f a hazardous substance or its packaging is subject to a cautionary labeling requirement under section 2(p) or 3(b) *** designed to protect against a risk of illness or injury associated with the substance, no State or political subdivision of a State may establish or continue in effect a cautionary labeling requirement applicable to such substance or packaging and designed to protect against the same risk of illness or injury unless such cautionary labeling requirement is identical to the labeling requirement under section 2(p) or 3(b) ***." 15 U.S.C. § 1261 note (b)(1)(A) (1988).

The gravamen of the plaintiff's claim against Graphic Color, like that of its claim against AMREP, is the defendant's failure to provide warnings of the dangers of Misty Paint Stripper and instructions regarding its proper use. Notably, the plaintiff does not contend that there is any basis for distinguishing between these two defendants. Nor does the plaintiff argue that Graphic Color made any special warranty or representation regarding the use of the paint stripper. Just as the plaintiff's claim against the product manufacturer is preempted by the Federal Hazardous Substances Act, so

too must be the plaintiff's corresponding claim against Graphic Color.

Cases construing the similar preemption provision of the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 *et seq.* (1988)) have held that a manufacturer may not be held liable for failing to provide point-of-sale or other warnings in addition to those that appear on the product label; the rationale for those decisions is that imposing such a requirement would improperly suggest that the label on the product itself was in some way deficient. (*Taylor AG Industries v. Pure-Gro* (9th Cir. 1995), 54 F.3d 555, 561; *Papas v. Upjohn Co.* (11th Cir. 1993), 985 F.2d 516, 519; *Jenkins v. Amchem Products, Inc.* (1994), 256 Kan. 602, 621-22, 886 P.2d 869, 881-82.) By the same token, in the absence of some special duty or warranty running between Graphic Color and the plaintiff, requiring Color Graphics to provide separate warnings of the product's dangers would suggest that the manufacturer's own label was inadequate. (See *Taylor AG Industries*, 54 F.3d at 561 & n.3.) To hold Graphic Color liable in these circumstances would be inconsistent with the preemptive goals of the Federal legislation. The majority correctly finds that the plaintiff's claim against AMREP is preempted by the FHSA, and I would extend the same reasoning to the plaintiff's claim against Graphic Color.