JAVETTE LYNN BROWN *et al.*, as Adm'rs of the Estate of Kayla Sue Cox, Deceased, *et al.*, Plaintiffs-Appellants, v. WALKER NURSING HOME, INC., *et al.*, Defendants-Appellees.

Fourth District   No. 4—98—0376

Opinion filed September 30, 1999.

722

R. John Alvarez and Phillip M. Kirby, both of Springfield, for appellants.

Karen L. Kendall and Brad A. Elward, both of Heyl, Royster, Voelker & Allen, of Peoria, and Frederick P. Velde, of Heyl, Royster, Voelker & Allen, of Springfield, for appellees.

JUSTICE COOK delivered the opinion of the court:

On January 9, 1995, Javette Brown (Brown) gave birth to Kayla Cox. Kayla was born prematurely, and shortly after birth she died from cardiorespiratory failure. In 1997, plaintiffs Brown and Randall Cox (Cox), individually and as administrators of the estate of Kayla Cox (collectively referred to as plaintiffs), filed claims against defendants Walker Nursing Home, Inc. (Walker), and Kathy Riner, L.P.N. (Riner) (Walker and Riner are collectively referred to as defendants). After plaintiffs filed their second-amended complaint, defendants moved for summary judgment. The trial court granted defendants' motion and plaintiffs appeal. We affirm.

## I. BACKGROUND

In July 1994, Brown began working for Walker as a certified nurse's assistant (CNA). Brown's job responsibilities included lifting and moving elderly nursing home residents. In October 1994, Brown learned she was pregnant. Shortly thereafter, Brown experienced complications with her pregnancy and her physician ordered her not

to lift anything in excess of 25 pounds. Both Walker and Riner were advised of Brown's pregnancy and weight restriction.

Brown was informed that if she continued to work, she was required to perform the normal duties of a CNA and that Walker could not accommodate her weight restriction. Brown continued to work because of her own financial necessity. However, after learning of Brown's condition, Walker transferred Brown to a different wing of the nursing home where two other CNAs were on duty and, according to Riner, they were encouraged to help Brown with any lifting. According to Brown, her daily activities on the east wing were the same as her previous assignment except that she had others available to help her when lifting patients. Brown also acknowledged, however, that she would lift weights in excess of her 25-pound weight restriction on a daily basis and that she was aware that she was violating her physician's restriction.

On the morning of January 8, 1995, Brown felt a sharp pain across her back while lifting a resident with help from another CNA. She informed Riner of a second incident a short time later but continued to work because she was not in pain. Brown knew both lifts violated her 25-pound weight restriction. Later in the morning when she was lifting a patient, Brown experienced a sensation in her abdominal area. Brown went to the rest room and felt a "bubble" protruding from her vaginal area, which appeared as she sat, but disappeared when she stood up. Brown reported the "bubble" to Riner, who told Brown that she should go to the hospital. Brown told Riner that she was not in any pain, and she did not appear to Riner to be in any pain. Brown did not know whether her condition was an emergency, but she claims she was beside herself and walked out of the rest room crying. Brown did not request an ambulance and did not request to lie down. Brown called Cox at their home, which was 18 miles away, and asked him to pick her up and take her to the hospital.

Riner asked Brown if she would finish feeding the residents before she left since the nursing home was under-staffed that day and it would take some time before Brown's ride arrived. Riner believed this activity would not be harmful to Brown because it simply involved sitting. According to Brown, at this point she was crying, hysterical, and upset, not only due to what had happened but also because Riner instructed her to feed the patients before going to the hospital. Cox arrived about 30 minutes later and took Brown to the hospital. The next day, January 9, 1995, Brown gave birth to Kayla, who died shortly thereafter.

Plaintiffs filed suit, alleging claims for wrongful death, a survival action, and intentional and negligent infliction of emotional distress.

In plaintiffs' second-amended complaint, they alleged that defendants breached their duty of reasonable care toward them in the following ways: (1) by failing to adhere to Brown's weight restriction; (2) by failing to find other work for Brown during the course of her pregnancy that would have been commensurate with her weight restriction; (3) by failing to have Brown proceed immediately to her physician on January 8, 1995, when she experienced complications with her pregnancy and by failing to provide medical attention to Brown; and (4) by requesting Brown to continue working despite the complications she was experiencing. These same points are alleged in each of plaintiffs' claims, including the intentional infliction of emotional distress claim against Walker.

Defendants moved for summary judgment, arguing that, under Illinois law, they owed no duty to plaintiff to accommodate her restrictions. Plaintiffs agreed that Illinois does not require an employer to provide light-duty work for its employees, nor does it require an employer to retain an "at will" employee who is medically unable to perform her job duties. At oral argument on the motion, plaintiffs argued that although defendants had no duty initially, they voluntarily assumed a duty to Brown once they moved her to another wing of the nursing home where she would have more assistance with lifting patients. The trial court granted defendants' motion for summary judgment, finding that defendants did not owe Brown a duty to accommodate her lifting restrictions and that defendants did not assume any additional duties to Brown by allowing her to work on a wing where she would have more assistance.

■ A trial court properly grants summary judgment when the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, reveal that no genuine issue exists as to any material fact and that the movant is entitled to judgment as a matter of law. *Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 333, 662 N.E.2d 397, 402 (1996). We review the grant of a summary judgment *de novo*. *Busch*, 169 Ill. 2d at 333, 662 N.E.2d at 402.

## II. ANALYSIS

In this appeal, plaintiffs raise no error specific to the dismissal of the intentional infliction of emotional distress claim against Walker. Rather, the issues raised relate to whether defendants voluntarily assumed a duty of care for Brown's safety by transferring her to an area where she would have assistance in lifting the nursing home residents.

■ To recover in this action, plaintiffs must establish that defendants owed Brown a duty, breached that duty, and that plaintiffs

have been injured as a proximate result of defendants' breach of the duty. *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140, 554 N.E.2d 223, 226 (1990). The existence of a duty, requiring one to conform to a certain standard of conduct to protect another against an unreasonable risk, is the foundation of every negligence case. Whether such a duty exists is a question of law to be determined by the court. *Rowe v. State Bank*, 125 Ill. 2d 203, 215, 531 N.E.2d 1358, 1364 (1988).

 In determining the existence of a duty, the court looks to the "reasonable foreseeability" of injury as an important factor. *Benner v. Bell*, 236 Ill. App. 3d 761, 765, 602 N.E.2d 896, 899 (1992). Such an approach directs the attention to the policy issues that determine the extent of the original duty, rather than to the mechanical sequence of events that make up causation. *Benner*, 236 Ill. App. 3d at 765, 602 N.E.2d at 899, citing W. Keeton, Prosser & Keeton on Torts § 42, at 274 (5th ed. 1984) (hereinafter Keeton). Other factors are also considered when determining whether a duty exists. "As Dean Prosser stated, '[I]t should be recognized that "duty" is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.' [Citations.] Whether a duty exists depends on a consideration of the likelihood of injury, the magnitude of the burden to guard against it, and the consequences of placing that burden upon the defendant." *Rowe*, 125 Ill. 2d at 227-28, 531 N.E.2d at 1369-70, quoting Keeton § 53, at 358.

 Plaintiffs agree that defendants had no affirmative duty to accommodate Brown's work restrictions. See *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 159, 601 N.E.2d 720, 728 (1992) (employer is not obligated to reassign employee to another position due to work restrictions). In fact, defendants had no duty to retain Brown if she were unable to perform her job requirements. This court has held that a medical inability to work is a legitimate reason for discharge. *Miller v. J.M. Jones Co.*, 225 Ill. App. 3d 799, 807, 587 N.E.2d 654, 660 (1992); see also *LaPorte v. Jostens, Inc.*, 213 Ill. App. 3d 1089, 1093, 572 N.E.2d 1209, 1212 (1991). After Brown's physician imposed the 25-pound weight limit, Brown was informed that if she wanted to continue her employment, she would have to perform all of her previous CNA duties. In an effort to lighten Brown's load, Walker moved her to a wing where other CNAs could assist her in performing her job responsibilities. Plaintiffs argue that by transferring Brown to a different wing, defendants voluntarily assumed a duty to exercise reasonable care for Brown's safety.

 In *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 74, 199 N.E.2d 769, 773 (1964), our supreme court gave recognition to the principle

that liability can arise from the negligent performance of a voluntary undertaking. "A duty voluntarily assumed must be performed with due care or 'such competence and skill as [one] possesses.' " *Cross v. Wells Fargo Alarm Services*, 82 Ill. 2d 313, 317, 412 N.E.2d 472, 474 (1980), quoting *Nelson*, 31 Ill. 2d at 86, 199 N.E.2d at 779. We are presented with one issue in this appeal. We must determine whether an employer, by voluntarily providing limited assistance to an employee in an attempt to assist the employee maintain her employment, assumes a duty to ensure the safety of the employee. Whether defendants have voluntarily undertaken this duty to plaintiff, which might support a negligence claim, is a question of law for the court, which is properly addressed in a motion for summary judgment. *Lavazzi v. McDonald's Corp.*, 239 Ill. App. 3d 403, 409, 606 N.E.2d 845, 849 (1992).

Illinois case law has consistently held that a court may take public policy considerations into account when determining if a duty has been voluntarily undertaken. *Nowak v. Coghill*, 296 Ill. App. 3d 886, 894, 695 N.E.2d 532, 538 (1998), citing *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 240, 665 N.E.2d 1260, 1273 (1996) (railroad employees' phone calls to the police about the presence of an injured man in a railroad station did not justify imposing a duty to rescue upon the railroad). Even prior to *Rhodes*, the supreme court indicated that a "narrow construction" of voluntary undertakings was "supported by public policy." *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 33-35, 605 N.E.2d 557, 560-61 (1992) (affirming summary judgment, finding that pharmacy that voluntarily placed drowsiness warning on prescription did not voluntarily assume responsibility to warn decedent of all possible dangers and side effects related to the medication).

Plaintiffs direct us to cases that have found defendants had voluntarily assumed duties they otherwise did not have. *Martin v. McDonald's Corp.*, 213 Ill. App. 3d 487, 491-93, 572 N.E.2d 1073, 1077-78 (1991) (franchisor liable for employee's murder where franchisor voluntarily instituted workplace security policy that *required* supervisory follow-up, and key security personnel failed to ensure implementation of policy); *Urbas v. Saintco, Inc.*, 264 Ill. App. 3d 111, 125-27, 636 N.E.2d 1214, 1223-25 (1994) (nightclub negligent for failing to discover employee unconscious in nightclub's parking lot where club voluntarily instituted security patrol to monitor lot).

█ We conclude that the situation presented here is distinguishable from *Martin* and *Urbas*. There, the employers actively provided an additional service for the protection of the employees, and the courts found those actions significant enough to constitute a voluntary undertaking. Here, defendants simply allowed Brown to work in a wing where she would have more assistance in performing her duties.

The nursing home could have terminated Brown if she were unable to perform her job. Brown independently chose to continue her employment, for necessary economic reasons, despite knowing her duties posed a risk to her pregnancy.

To hold that defendants assumed a duty to ensure Brown's safety under these facts would deter employers from attempting to accommodate employees with temporary work restrictions. Imposing a duty in this situation would be an undue burden upon Walker and contrary to public policy. If we were to impose a duty, employers who try to accommodate employees would in effect become the insurer of the employees' well-being, a responsibility no employer would be willing to accept. Instead, employers would simply terminate the employee rather than risk civil liability. Based upon the facts presented in this case, we find that defendants did not voluntarily assume a duty to Brown by allowing her to work in a wing where she would have more assistance. Thus, plaintiffs cannot establish a foundational element of their *prima facie* case, and we affirm the trial court's grant of summary judgment.

Affirmed.

STEIGMANN and McCULLOUGH, JJ., concur.